CINCOM SYSTEMS, INC., Plaintiff,

v.

The UNITED STATES, Defendant,

and

Western Data Systems, Third–Party Intervenor.

No. 97–72C.

United States Court of Federal Claims.

April 11, 1997.[1]

parties an opportunity to comment on information they deemed to be proprietary, this opinion is being released for publication. The court did not redact all the requested material because some of the requested material was not, in the court's view, "proprietary" information. Redactions are indicated by asterisks within brackets ([* *]).

Carl J. Peckinpaugh, Washington, D.C., for plaintiff. Eric J. Marcotte and Winston & Strawn, of counsel.

Elizabeth M. Hosford, Department of Justice, Washington, D.C., with whom was Assistant Attorney General Frank W. Hunger, for defendant. David M. Cohen, Director; Kirk

T. Manhardt, Assistant Director; and Johnny L. Litman, III, U.S. Marine Corps Logistics Base, of counsel.

Kenneth B. Weckstein, Washington, D.C., for Third–Party Intervenor. Shlomo D. Katz and Epstein, Becker & Green, P.C., of counsel.

## OPINION

FUTEY, Judge.

This post-award bid protest action is presently before the court on plaintiff's motion for summary judgment, defendant's motion to dismiss and motion for summary judgment, and intervenor's motion for summary judgment. Plaintiff alleges defendant acted arbitrarily and capriciously when it awarded a contract to intervenor, Western Data Systems (WDS). Plaintiff argues that it is entitled to the award of that contract and not WDS. In response, defendant and WDS maintain that defendant acted reasonably and that plaintiff is not entitled to the requested relief. Defendant further contends that plaintiff is not an interested party and does not have standing to bring the present claim. Plaintiff refutes this assertion.

### Factual Background

On April 9, 1996, defendant, acting through the United States Marine Corps, issued Solicitation No. M67004–96–R–0006 (solicitation) for commercial off-the-shelf Manufacturing Resource Planning (MRP II COTS) software for use in reparables management at Department of Defense (DoD) maintenance depots. The software was required to perform planning, scheduling, and tracking functions for the repair of depot maintenance reparable items. The solicitation states:

The application software should be technically and functionally compatible with the Joint Logistics Systems Center depot maintenance migration systems and consistent with the Defense Information Systems Agency's (DISA's) Technical Architecture Framework for Information Management (TAFIM). It must be capable of operating in an open-system client-server environ-

ment with a relational database, Structural Query Language (SQL) access and a standard graphical user interface (GUI). *The application must be able to support a minimum of 250 concurrent users and 1,000 transactions per minute while executing normal daytime batch run processes, if any, in background.*[2]

The solicitation further provides:

The following screening criteria are the Government's minimum requirements. If an offeror cannot meet all of the criteria identified below, their proposal will not be evaluated any further. These criteria are absolute. Either they meet the criteria or they do not.

\* \* \* \*

5. The application must operate on the following server platforms: HP 9000 and Sun Sparc Center 2000.[3]

In addition, the solicitation requires defendant to evaluate the proposals in three separate phases: (1) an initial screening evaluation; (2) a detailed evaluation; and (3) an Operational Capabilities Demonstration (OCD). The solicitation also directs defendant to award the contract to the offeror whose proposal provides the best overall value to defendant, with an expected award date of September 30, 1996.

In response to the solicitation, plaintiff, WDS, and one other company submitted proposals to defendant on May 24, 1996. At the time plaintiff submitted its proposal, plaintiff did not have the capability to operate its software on the Sun Sparc Center 2000 (Sun Sparc server). In its proposal, however, plaintiff informed defendant that it would have the capability to operate on that server by September 30, 1996.

During the initial screening evaluation, conducted between May 29, 1996, and May 31, 1996, the proposals were evaluated to determine whether the offered software included certain mandatory features, including the requirement that the offerors' software be operable on the Sun Sparc server. The

**2.** Administrative Record (A.R.), Tab 3 at Solicitation Attachment I, Statement of Work, 1.2 (emphasis added).

**3.** *Id.,* Tab 3 at M–1, M–2.

results of the initial screening evaluation were reported in defendant's Source Selection Evaluation Team Technical Report (Technical Report), dated June 21, 1996. In the Technical Report, defendant noted plaintiff's inability to satisfy the mandatory initial screening evaluation requirement that its software be operable on the Sun Sparc server. Defendant also made reference to plaintiff's representation in its proposal that its software would be operational on that server by September 30, 1996. Based upon that assurance, defendant first noted that the criteria in the solicitation was not specific regarding the timeframe in which the applications should be operational. Defendant further stated that plaintiff's "proposed availability of their software on the Sun Sparc hardware would have no adverse impact to the accomplishments of the objectives of this solicitation."[4] Defendant concluded that plaintiff, as well as the other two offerors, passed the initial screening evaluation.[5]

After passing the initial screening evaluation, all three proposals were then subjected to the detailed evaluation, as outlined in the solicitation. The detailed evaluation, conducted between June 4, 1996, and June 21, 1996, addressed the technical merits of each proposal. Specifically, proposals were evaluated for: (1) functional capabilities; (2) technical capabilities; (3) past performance; (4) interfaceability; (5) life cycle support; and (6) subcontracting plan goals. Defendant utilized this evaluation in determining both the competitive range of each proposal and which offerors could proceed to the OCD. The results of the detailed evaluation, which were also presented in the Technical Report, indicated that all the offerors "have been judged during the detailed evaluation to be susceptible to being acceptable based upon responses to clarification requests."[6] Further, the Technical Report recommended

that all three offerors proceed to the third phase of evaluation, the OCD.

On June 27, 1996, the contracting officer (CO), in reliance on the Technical Report, determined that all three offerors were within the competitive range for this procurement. Pursuant to 48 C.F.R. § 15.610(b) (1996), the CO then initiated discussions with the offerors. During discussions with plaintiff, the CO requested responses to certain questions, including:

[(e)] (1) What does the offeror require the Government to have in place in order to implement their solution?

\* \* \* \*

(9) Offeror's proposal indicates that its application will operate on Sun Sparc 2000 by 30 September 1996. Please clarify the current state of this capability ... has it been developed, tested, rolled out to a Beta site? When will it be offered as an operational system by the offeror?[7]

By letter dated August I, 1996, plaintiff provided the following reply to question (e)(1):

The following *general* hardware and software which is expected to be furnished by the Government is being addressed below. The specific requirements for each site would be determined as a result of the individual site surveys and provided to the Government as part of our deliverables per the CDRLs.

1. Hardware:

— A UNIX Server (*or servers*)

\* \* \* \*

ORACLE Distributed Database Option— required for each concurrent user needing access to data across multiple servers,

ORACLE Parallel Query Option—required for each concurrent user needing access to data across multiple servers.[8]

---

4. *Id.,* Tab 6 at 3.

5. The initial screening evaluation also required that "[a]t least one customer must have been using the MRP II COTS application for more than one year." *Id.,* Tab 3 at M–1. None of the offerors, however, were able to satisfy this criteria. Despite this deficiency, defendant determined that "there is enough ambiguity in our requirement that all three passed since that they

all have MRP II software that has been operational more than one year." *Id.,* Tab 16 at 3.

6. *Id.,* Tab 6 at 9.

7. *Id.,* Tab 9B at 2–3.

8. *Id.,* Tab 13B at 4 (emphasis added).

Plaintiff responded to question (9) by stating that "[t]he operational Sun Sparc 2000 system will be available September 30, 1996." [9] This promised date was the same date provided by plaintiff in its proposal.

Simultaneous with the discussions between the CO and the offerors, all three offerors proceeded to the OCD phase of the procurement.[10] According to the solicitation, the OCD is a demonstration designed to confirm the credibility of an offeror's proposal. At plaintiff's OCD, conducted on July 15 and 16, 1996, defendant's evaluation team noted, among other observations, that plaintiff's software suffered from slow response time.

Once the OCD phase of the procurement was completed, defendant, on August 20, 1996, requested Best and Final Offers (BAFOs) from plaintiff and WDS. In response, plaintiff submitted a BAFO of [* *] million, and WDS submitted a BAFO of $29.46 million. Subsequent to the submission of the BAFOs, defendant, pursuant to the solicitation, conducted a cost realism analysis to determine the total cost to defendant for each offeror's proposal. This analysis sought to identify additional costs to be incurred by defendant for third party software, hardware, and operating systems that would be necessary to operate the offeror's proposed application but were not included in the offeror's BAFO. As a result of this analysis, defendant determined that plaintiff's solution required, among other things, additional software, including Oracle Distributed Database Option and Oracle Parallel Query Option (additional Oracle software). This cost realism adjustment resulted in an evaluated price of [* *] million for plaintiff. Defendant also conducted a cost realism analysis with respect to WDS' proposal and determined that WDS' proposal also required additional software. This software, however, did not include the additional Oracle software added to plaintiff's proposal. The cost realism adjust-ment to WDS' proposal resulted in an evaluated price of [* *] million for WDS.

After the offerors' prices were adjusted for cost realism, defendant considered which offerors' proposal provided the best overall value to defendant. This best value analysis compared the differences in value of the technical features of the proposals with the differences in cost to defendant. Based upon the best value analysis, defendant found that WDS' proposal represented three positive benefits and two negative benefits for an overall positive rating.[11] Plaintiff's proposal, on the other hand, represented one positive benefit and four negative benefits for an overall negative rating.[12]

On September 5, 1996, defendant issued its Source Selection Evaluation Team Final Technical Report (Final Technical Report). According to that report, plaintiff's score from the detailed evaluation exceeded WDS', and WDS' score at the OCD exceeded plaintiff's. The combination of the scores from the detailed evaluation and the OCD resulted in plaintiff and WDS receiving final evaluation scores of 6.33 and 6.14, respectively.[13] Defendant then consolidated the results from both the cost realism and the best value analyses in order to make a final best value determination. With regard to this final best value determination, the solicitation states that "the Government is more concerned with obtaining superior technical performance than with making an award at the lowest overall cost to the Government." [14] After making its comparison, defendant concluded that WDS "provides the lowest realistic cost with the most potential positive impact on estimated benefits." [15] Thus, defendant determined that WDS "provides the package that would be the most technically accepted package by the DoD community." [16] On September 27, 1996, defendant awarded the contract to WDS.

9. *Id.,* Tab 13B at 10.

10. To avoid confusion, the court will make no further reference to the third offeror.

11. *Id.,* Tab 16 at 25.

12. *Id.*

13. Defendant considered the two proposals to be technically equal. *Id.,* Tab E at 6.

14. *Id.,* Tab 3 at M–3.

15. *Id.,* Tab 16 at 25.

16. *Id.,* Tab 16 at 26.

On October 11, 1996, plaintiff filed a formal protest with the General Accounting Office (GAO). Before the GAO, plaintiff asserted that defendant improperly added the cost of the additional Oracle software to its proposal. Arguing that its solution could operate on a single server, plaintiff contended that the additional Oracle software was not required. In response, defendant stressed that plaintiff's solution required multiple servers and, therefore, required the additional Oracle software. In support of this position, defendant maintained that: (1) plaintiff's system demonstrated slow response time at the OCD; (2) a customer reference provided by plaintiff experienced significant run-time problems using the proposed software at a much lower performance level than required by the solicitation; and (3) plaintiff's sizing guide indicated that the largest server available utilizing plaintiff's software could not support the total number of daily transactions required by the solicitation.

The GAO issued its decision denying plaintiff's protest on January 21, 1997. The GAO found that defendant acted reasonably when it determined that plaintiff's solution would require at least two servers in order to meet the minimum performance requirements of the solicitation. Accordingly, the GAO concluded that, once defendant had determined that multiple servers were necessary to implement plaintiff's solution, it was reasonable for defendant to add the cost of the additional Oracle software to plaintiff's proposal.

On January 31, 1997, plaintiff filed its complaint in this court. In the complaint, plaintiff asks the court to: (1) declare that defendant improperly awarded the contract to WDS; (2) declare that plaintiff is entitled to the subject contract; and (3) permanently enjoin defendant from taking any actions inconsistent with the requested declarations. Also on that date, plaintiff filed an application requesting a temporary restraining order and motion for a preliminary injunction seeking to enjoin defendant from proceeding with the performance of the contract awarded to WDS. In an order and opinion filed February 13, 1997, the court denied that request. *Cincom Sys., Inc. v. United States,* 37 Fed.Cl. 266 (1997).

On February 20, 1997, plaintiff, defendant, and WDS filed motions for summary judgment. Plaintiff contends defendant acted arbitrarily and capriciously in awarding the contract to WDS. In response, defendant and WDS maintain that defendant's conduct regarding this procurement was reasonable. Along with its motion for summary judgment, defendant filed a motion to dismiss alleging that plaintiff is not an interested party and does not have standing to bring the present claim. Plaintiff counters by stating that defendant's assertion is inconsistent with defendant's conduct during this procurement. On February 27, 1997, the court heard oral argument on the parties' motions.

## Discussion

### I.  Motion to Dismiss

In ruling on a motion to dismiss for lack of subject matter jurisdiction under RCFC 12(b)(1), the court must accept as true the complaint's undisputed factual allegations and construe the facts in the light most favorable to the plaintiff. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Hamlet v. United States,* 873 F.2d 1414, 1415 (Fed.Cir.1989); *Farmers Grain Co. v. United States,* 29 Fed. Cl. 684, 686 (1993). A plaintiff must only make a *prima facie* showing of jurisdictional facts in order to avoid a defendant's motion to dismiss. *Raymark Indus., Inc. v. United States,* 15 Cl.Ct. 334, 338 (1988) (citing *Data Disc, Inc. v. Systems Tech. Assoc., Inc.,* 557 F.2d 1280, 1285 (9th Cir.1977)). If the undisputed facts reveal any possible basis on which the non-moving party may prevail, the court must deny the motion. *Scheuer,* 416 U.S. at 236, 94 S.Ct. at 1686; *W.R. Cooper Gen. Contractor, Inc. v. United States,* 843 F.2d 1362, 1364 (Fed.Cir.1988). If the motion challenges the truth of the jurisdictional facts alleged in the complaint, however, the court may consider relevant evidence in order to resolve the factual dispute. *Rocovich v. United States,* 933 F.2d 991, 994 (Fed.Cir. 1991). "The court should look beyond the pleadings and decide for itself those facts, even in dispute, which are necessary for a determination of [the] jurisdictional merits."

*Farmers Grain,* 29 Fed. Cl. at 686 (citing *Raymark,* 15 Cl.Ct. at 335).

Congress has been given authority, pursuant to the Constitution of the United States, to define the jurisdiction of the courts. *See Keene Corp. v. United States,* 508 U.S. 200, 207, 113 S.Ct. 2035, 2040, 124 L.Ed.2d 118 (1993). "The limits upon federal jurisdiction, whether imposed by the Constitution or Congress, must be neither disregarded nor evaded." *Owen Equipment & Erection Co. v. Kroger,* 437 U.S. 365, 374, 98 S.Ct. 2396, 2403, 57 L.Ed.2d 274 (1978). This court's authority to grant relief is dependent upon the extent to which the United States has waived its sovereign immunity and consented to be sued. *United States v. Testan,* 424 U.S. 392, 399, 96 S.Ct. 948, 953–54, 47 L.Ed.2d 114 (1976).

■ Previously, pursuant to 28 U.S.C. § 1491(a)(3) (1994), this court had authority to grant injunctive relief in pre-award bid protest actions. *See United States v. John C. Grimberg Co.,* 702 F.2d 1362, 1369 (Fed. Cir.1983) (the court's equitable powers under 28 U.S.C. § 1491(a)(3) "can be invoked only by filing a claim with the court before a contract is awarded"). In 1996, Congress amended § 1491 and expanded this court's jurisdiction. 28 U.S.C. § 1491(b) (1994), *as amended by* Administrative Dispute Resolution Act of 1996, Pub.L. No. 104–320, 110 Stat. 3870, 3874–75 (1996).[17] Under the amended version of the statute, this court, concurrently with the federal district courts, maintains jurisdiction over post-award bid protests. *Id.; see Cubic Applications, Inc. v. United States,* 37 Fed.Cl. 339, 340–41 (1997). In addition, the amended statute indicates that a protest may only be brought by an "interested party." § 1491(b)(1). This term, although not defined in the statute, is the same term used in the statute granting protest authority to the Comptroller General. *See* 31 U.S.C. § 3551(2) (1994). That statute states that an "interested party" is "an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by a failure to award the contract." *Id.* The Court of Appeals for the Federal Circuit has interpreted "interested party" to mean that a protest may be initiated "only by an actual or prospective bidder who would have been in a position to receive the challenged award." *Federal Data Corp. v. United States,* 911 F.2d 699, 703 (Fed.Cir.1990).

■ Here, the contract has been awarded and plaintiff brings its claim as an interested party pursuant to the court's expanded jurisdiction to entertain post-award bid protests. Defendant, however, contends that the court lacks jurisdiction to consider plaintiff's complaint because plaintiff is not an interested party in this action. According to defendant, plaintiff never cured its failure to meet one of the mandatory initial screening evaluation requirements. More specifically, defendant alleges that, to date, plaintiff cannot operate its software on the Sun Sparc server as required by the solicitation. Defendant maintains that, without this capability, plaintiff's proposal is technically unacceptable and, therefore, plaintiff cannot be in a position to receive the challenged award. In response, plaintiff avers that, because defendant determined plaintiff passed the initial screening evaluation phase, plaintiff's propos-

---

**17.** Section 1491, as amended, states, in pertinent part:

(b)(1) Both the United States Court of Federal Claims and the district courts of the United States shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement. Both the United States Court of Federal Claims and the district courts of the United States shall have jurisdiction to entertain such an action without regard to whether suit is instituted before or after the contract is awarded.

(2) To afford relief in such action, the courts may award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs.

(3) In exercising jurisdiction under this subsection, the courts shall give due regard to the interests of national security and the need for expeditious resolution of the action.

(4) In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5.

al was technically acceptable and plaintiff was in-line for award of the contract.

Despite defendant's present assertions, defendant's Technical Report, while noting that plaintiff's software did not operate on the Sun Sparc server, determined that plaintiff passed the initial screening evaluation phase. This finding was reiterated in the Final Technical Report. Defendant further considered plaintiff's assurance that its software would be operable on the Sun Sparc server by September 30, 1996. Based upon its own interpretation that the solicitation "was not specific to the timeframe the applications should be operational," [18] defendant concluded that plaintiff passed the initial screening evaluation. Defendant's conduct indicates that it considered plaintiff to be a prospective bidder who may "have been in a position to receive the challenged award." *Id.*

In addition, plaintiff represents to the court that its "application was fully operational on [the] Sun Sparc 2000 as of September 26, 1996." [19] Accordingly, plaintiff has adequately demonstrated that it is an interested party with a " 'direct economic interest that would be affected by the award of a contract or failure to award the contract.' " *Id.* (quoting *United States v. International Bus. Machs. Corp.*, 892 F.2d 1006, 1010 (Fed. Cir.1989)).[20] The court denies defendant's motion to dismiss.

II. *Summary Judgment*

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Jay v. Secretary, DHHS*, 998 F.2d 979 (Fed. Cir.1993). A fact is material if it might significantly affect the outcome of the suit under the governing law. *Anderson*, 477

U.S. at 248, 106 S.Ct. at 2510. The party moving for summary judgment bears the initial burden of demonstrating the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). If the moving party demonstrates an absence of a genuine issue of material fact, the burden then shifts to the non-moving party to show that a genuine issue exists. *Sweats Fashions, Inc., v. Pannill Knitting Co.*, 833 F.2d 1560, 1563 (Fed.Cir.1987). Alternatively, if the moving party can show there is an absence of evidence to support the non-moving party's case, then the burden shifts to the non-moving party to proffer such evidence. *Celotex*, 477 U.S. at 325, 106 S.Ct. at 2553–54. The court must resolve any doubts about factual issues in favor of the non-moving party, *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163 (Fed.Cir. 1985), to whom the benefits of all favorable inferences and presumptions run. *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

The fact that both parties have moved for summary judgment does not relieve the court of its responsibility to determine the appropriateness of summary disposition. *Prineville Sawmill Co. v. United States*, 859 F.2d 905, 911 (Fed.Cir.1988) (citing *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed.Cir.1987)). Summary judgment will not necessarily be granted to one party or another simply because both parties have moved for summary judgment. *Corman v. United States*, 26 Cl. Ct. 1011, 1014 (1992) (citing *LewRon Television, Inc. v. D.H. Overmyer Leasing Co.*, 401 F.2d 689, 692–93 (4th Cir.1968), *cert. denied*, 393 U.S. 1083, 89 S.Ct. 866, 21 L.Ed.2d 776 (1969)). A cross-motion is a party's claim that it alone is entitled to summary judg-

---

18. A.R., Tab 6 at 3.

19. Plaintiff's Memorandum of Points and Authorities in Support of Plaintiff's Motion for Summary Judgment at 33 (Pl.'s Mot.) (citing A.R., Tab 1).

20. This finding is consistent with defendant's interpretation and application of the solicitation

requirements. For example, defendant determined that all offerors passed the initial screening evaluation, including the requirement that "[a]t least one customer must have been using the MRP II application for more than one year," despite the fact that none of the offerors satisfied this criteria. A.R., Tab 16 at 3.

ment. *A Olympic Forwarder, Inc., v. United States*, 33 Fed. Cl. 514, 518 (1995). It therefore does not follow that if one motion is rejected, the other is necessarily supported. *Id.* Rather, the court must evaluate each party's motion on its own merit and resolve all reasonable inferences against the party whose motion is under consideration. *Id.* (citing *Corman*, 26 Cl.Ct. at 1014).

◼ Whenever the government solicits proposals or invites bids, it enters into an implied-in-fact·contract with the offerors to treat them fairly. *IMS, Servs., Inc. v. United States*, 33 Fed. Cl. 167, 178 (1995); *see also Keco Indus., Inc. v. United States*, 203 Ct.Cl. 566, 492 F.2d 1200, 1203 (1974); *Crux Computer Corp. v. United States*, 24 Cl.Ct. 223, 225 (1991). This implied-in-fact contract between the government and bidders on the underlying contract requires the government to fully and fairly consider all bids submitted in accordance with the invitation for bids. *E.W. Bliss Co. v. United States*, 77 F.3d 445, 447 (Fed.Cir.1996); *Ingersoll–Rand Co. v. United States*, 2 Cl.Ct. 373, 375 (1983). "[O]nly violations that amount to a breach of the government's implied contract to consider an offer fairly and honestly will support the court's exercise of injunctive power." *Central Ark. Maintenance, Inc. v. United States*, 68 F.3d 1338, 1342 (Fed.Cir.1995).

◼ The court's authority to grant declaratory relief in this case is limited to a determination of whether the government breached its implied contract of fair dealing with plaintiff. *Ingersoll–Rand*, 2 Cl.Ct. at 376. In order to show that defendant breached its implied contract of fair dealing, plaintiff must show that defendant's actions toward plaintiff were arbitrary and capricious. *E.W. Bliss*, 77 F.3d at 447. Plaintiff bears the burden of proving the breach by clear and convincing evidence. *126 Northpoint Plaza Ltd. Partnership v. United States*, 34 Fed. Cl. 105, 107, *appeal dismissed*, 73 F.3d 379 (C.A.Fed. 1995). To that end, plaintiff argues that defendant acted arbitrarily and capriciously in: (1) determining that plaintiff's solution required the additional Oracle software; (2)

failing to conduct meaningful discussions with plaintiff; and (3) failing to treat plaintiff fairly and equally. Defendant and WDS maintain that plaintiff has failed to show its entitlement to the requested relief by clear and convincing evidence.

In determining whether defendant has acted arbitrarily or capriciously toward plaintiff, the court must consider four factors. *Keco*, 492 F.2d at 1203–04. Namely, the court must decide whether: (1) there was subjective bad faith on the part of the procuring officials, thus depriving plaintiff of fair and honest consideration of its proposal; (2) there was a reasonable basis for the procuring officials' decision; (3) the procuring officials abused their discretion; and (4) the procuring officials violated pertinent statutes or regulations. *Id.*

### A. Bad Faith

◼ Plaintiff has not alleged any bad faith on the part of any of the contracting officials who conducted this procurement. Rather, plaintiff simply disagrees with defendant's evaluation of plaintiff's proposal. There is, however, a strong presumption that government officials act correctly, honestly, and in good faith when considering bids. *Finley v. United States*, 31 Fed. Cl. 704, 706 (1994) (indicating that disagreement does not equal bad faith), *appeal dismissed*, 50 F.3d 21 (Fed.Cir.1995); *CACI Field Servs., Inc. v. United States*, 13 Cl.Ct. 718, 729–30 (1987), aff'd, 854 F.2d 964 (7th Cir.1988). Plaintiff does not rebut that presumption.

### B. Reasonable Basis and Discretion [21]

◼ Contracting officials may properly exercise wide discretion in their evaluation of bids and the application of procurement regulations. *Electro–Methods, Inc. v. United States*, 7 Cl.Ct. 755, 762 (1985); *see RADVA Corp. v. United States*, 17 Cl.Ct. 812, 818 (1989), aff'd without op., 914 F.2d 271 (Fed. Cir.1990). This discretion is especially broad in negotiated procurements, such as the one involved in the present case. *CACI*, 13 Cl.

---

21. The second and third factors are most logically addressed together. *Compubahn, Inc. v. Unit-* *ed States,* 33 Fed. Cl. 677, 682 (1995).

Ct. at 726; *Hayes Int'l Corp. v. United States*, 7 Cl.Ct. 681, 685 (1985).

■ It is well-settled that courts should respect acts of procuring officials when they exercise their discretionary functions. *Compubahn, Inc. v. United States*, 33 Fed. Cl. 677, 683 (1995); *RADVA*, 17 Cl.Ct. at 818; *Howell Constr., Inc. v. United States*, 12 Cl.Ct. 450, 452 (1987). The court should not substitute its judgment for that of a procuring agency and should intervene only when it is clear that the agency's determinations were irrational or unreasonable. *Baird Corp. v. United States*, 1 Cl.Ct. 662, 664 (1983). It is the burden of the aggrieved bidder to demonstrate that there is no rational basis for the agency's determination. *Id.*

■ Here, plaintiff asserts there was no rational basis for defendant to award the contract to WDS. Further, plaintiff maintains that the contracting officials abused their discretion in: (1) adding the cost of the additional Oracle software to plaintiff's proposal; (2) not discussing with plaintiff defendant's alleged finding that multiple servers would be required to implement plaintiff's solution; and (3) treating plaintiff differently by not adding the cost of the additional Oracle software to WDS' proposal.

### 1. *Multiple servers*

Plaintiff contends that, because its proposal did not require multiple servers, the additional Oracle software was not necessary to implement its solution. Further, plaintiff stresses that defendant never even determined that plaintiff's proposal required multiple servers. In that regard, plaintiff refers to Exhibit 20 of the Final Technical Report, in which defendant identified the hardware and software defendant would be required to acquire in order to effectively operate plaintiff's proposed solution. Although the exhibit lists the additional Oracle software, it does not indicate a need for multiple servers. Plaintiff therefore asserts that defendant erroneously determined that plaintiff's proposal required the additional Oracle software. In response, defendant argues that the adminis-

trative record adequately demonstrates that the contracting officials, in their broad discretion, determined that plaintiff's proposal required multiple servers in order to meet the solicitation's performance requirements.

Plaintiff argues that the Final Technical Report does not indicate that multiple servers are required to implement plaintiff's solution. Absent such an express finding, plaintiff asserts that the Final Technical Report provides no basis for defendant's contention that multiple servers were required to implement plaintiff's solution.

In reference to Exhibit 20 and defendant's cost realism analysis, the report states:

> Also identified were additional costs required to be incurred by the Government for third party software, hardware and operating systems required to operate the offeror's proposed software, but not included in their bid. In this analysis, *common items and costs to all offerors were not considered nor included in the total additive cost. This analysis only considered the discriminators between proposals.*[22]

As defendant correctly notes, the purpose of this language is to identify discriminators between proposals. Discriminators are factors that are unique to the requirements of each proposal and do not include costs common to all proposals.

Defendant identified the additional Oracle software as a discriminator between proposals. In this regard, defendant determined that plaintiff's proposal would be the only proposal requiring the additional Oracle software while operating across multiple servers. Moreover, as defendant noted at oral argument:

> [Defendant] has never stated that—it has precluded the possibility that multiple servers would be used on all solutions. What they're saying is in this case [plaintiff] can't operate across multiple servers unless it's got the [additional Oracle software]. So to the extent that [defendant] might ultimately use multiple servers ... [plaintiff] is the only one that needed this

---

22. A.R., Tab 16 at 21 (emphasis added).

software to operate across multiple servers.[23]

The fact that Exhibit 20 does not reference the need for multiple servers does not alter that conclusion.

Further, defendant's determination that plaintiff's proposal required multiple servers is adequately supported by the administrative record. The administrative record indicates that defendant was concerned with plaintiff's ability to meet the solicitation requirement of 250 concurrent users and 1,000 transactions per minute. Regarding this concern, defendant noted that: (1) plaintiff's software appeared slow at the OCD; (2) one of plaintiff's past performance references reported slow response times while utilizing plaintiff's software at a much lower performance level than required by the solicitation; and (3) plaintiff's sizing guide indicated that multiple servers were required in order to meet the solicitation's performance requirement.

Plaintiff now argues that "the OCD was not designed to measure system performance and cannot be relied upon by [defendant] to support any adverse view of [plaintiff's] ability to meet specified parameters." [24] Specifically, plaintiff refers to defendant's memorandum dated August 11, 1996. In that memorandum, defendant stated: "the OCD team was unable to evaluate performance." [25] The solicitation, however, in listing the criteria for evaluating the OCD, specifically indicates that defendant will evaluate an offeror's demonstration for "adequate system response times." [26] Defendant's evaluation team at the OCD found that plaintiff's software suffered from slow response time. Defendant considered the slow response time as a weakness in plaintiff's proposal. Further, the Final Technical Report identified a concern with plaintiff's ability to handle the required workload. The report noted that plaintiff's "configuration places a greater workload on the HP 9000 or other host. . . . [T]he communication layer at the server could become overloaded and result in performance degradation." [27] These observations support the reasonableness of defendant's contention that plaintiff's proposal could not meet the solicitation's performance requirement.

In addition, despite plaintiff's assertions to the contrary, it was reasonable for defendant to rely on a past performance customer reference provided by plaintiff. Importantly, the solicitation states that past performance will be considered in evaluating an offeror's proposal and further directs defendant to inquire:

> Do the offeror's references validate the use of the offeror's MRP II COTS application as it was proposed and are their environments of a similar scope as those required for DoD depots? *Do the references validate that the offeror's product can support a minimum of 250 concurrent users entering transactions at one time?* How do the references rate the offeror's performance in regards to responsiveness, documentation and training? [28]

This provision of the solicitation expressly permits defendant to consider past performance customer references to validate whether plaintiff's software could meet the performance requirement of the solicitation.

The customer reference that plaintiff is challenging here involves a telephonic interview conducted by defendant. During that interview, the customer reference indicated that it was having "trouble with [* *]." [29] Under the present solicitation, however, the offered software must have the capability to operate with 250 concurrent users. A comparison of the information provided by the customer reference and the solicitation requirement supports the reasonableness of defendant's contention that plaintiff would have

---

23. Transcript at 60 (Tr.).

24. Pl.'s Mot. at 17 (citing A.R., Tab 3 at M–8).

25. A.R., Tab 25A at Memorandum for Record of Christina M. Kauffman.

26. *Id.*, Tab 3 at M–8, M–9.

27. *Id.*, Tab 25B at Memorandum for Record of Christina M. Kauffman.

28. *Id.*, Tab 3 at M–6 (emphasis added).

29. *Id.*, Tab 26 at 1.

difficulty operating with 250 concurrent users.

Defendant also reasonably relied upon its interpretation of plaintiff's sizing guide. Pursuant to the sizing guide, which plaintiff included with its proposal, the largest HP 9000 server operating with plaintiff's software could accommodate a maximum of 254,-016 transactions in an eight-hour period. In order to meet the solicitation's requirement, however, a single server would be required to accommodate 480,000 transactions during an eight-hour period. Based upon a comparison of these figures, defendant argues that plaintiff's proposal required multiple servers in order to satisfy the requirement of the solicitation.

In response, plaintiff maintains that defendant did not read the sizing guide properly. According to plaintiff, the sizing guide does not measure the performance of plaintiff's software in the same manner as the solicitation. The solicitation measures transactions in terms of Oracle transactions, while plaintiff's sizing guide measures transactions in terms of bundled transactions, or Control:Open transactions. Plaintiff asserts that one Control:Open transaction actually represents a number of Oracle transactions. More specifically, plaintiff contends "Control[:Open] transaction can be made up of thirty or more individual Oracle transactions."[30] According to plaintiff, its proposal indicates that " 'one Control[:Open] transaction can actually create 4 or 5 Oracle updates.' "[31] Further, plaintiff explained at oral argument that "[it] clearly told [defendant] that the sizing guide measured [Control:O]pen transactions and was not stated in terms of Oracle transactions and invited [defendant], if it wasn't a good enough response, to conduct discussions with respect to this point specifically."[32]

The timing of plaintiff's invitation to discuss with defendant the meaning of. "Oracle update" or "transaction," however, is contrary to the requirements of the solicitation.

The solicitation incorporates, by reference, 48 C.F.R. § 52.215–14 (1984), which states:[33]

Any prospective offeror desiring an explanation or interpretation of the solicitation, drawing, specification must request it in writing soon enough to allow a reply to reach all prospective offerors before the submission of their offers.

To the extent that plaintiff invited a discussion with defendant about the terms of the solicitation, the inclusion of that request in its proposal is inconsistent with Section 52.215–14. Pursuant to Section 52.215–14, plaintiff was obligated to seek an explanation early enough in this procurement for defendant to reply to all prospective offerors before they submitted their offers. Plaintiff's failure to comply with this requirement precludes it from arguing that it invited defendant to discuss the terms of the solicitation identified in its proposal.

Further, plaintiff's proposal does not provide a definition for either "Oracle update" or "transaction." Pursuant to the solicitation, it was incumbent upon plaintiff to define those terms if it intended a specific definition for them. Specifically, the solicitation provides:

Each response must be consistent with the terminology used throughout the proposal. In order to prevent any misinterpretations, the offeror shall pay particular attention to the definitions detailed in the Glossary of Terms and Abbreviations contained in Attachment # 1, enclosure B of this solicitation. *The offeror shall ensure differences in definitions are detailed in their proposal.*[34]

Although the Glossary of Terms and Abbreviations (Glossary) does not provide a definition for either "Oracle update" or "transaction," the above-quoted solicitation requirement does not limit the terms requiring definitions only to those found in the Glossary. Rather, the requirement notes only that the offeror "shall pay particular

---

**30.** Pl.'s Mot. at 20 (citing A.R., Tab K at 4).

**31.** *Plaintiff's Response to Defendant's and Intervenor's Dispositive Motions* at 6 (citing A.R., Tab 30B, vol. B, attachment 1 at 49).

**32.** Tr. at 35–36.

**33.** A.R., Tab 3 at L–1.

**34.** *Id.*, Tab 3 at L–7 (emphasis added).

attention to the definitions detailed in the [Glossary]." [35] This language indicates that an offeror also may be required to provide specific definitions to terms not included in the Glossary. If plaintiff contemplated a unique definition for either "Oracle update" or "transaction," it was plaintiff's responsibility to apprise defendant of that definition. Absent such clarification, defendant reasonably concluded that the transactions in the sizing guide represented transactions comparable to those in the solicitation. Thus, defendant could reasonably rely upon the sizing guide in further support of its position that plaintiff's solution required multiple servers.

Once defendant determined that multiple servers were required to implement plaintiff's solution, it could reasonably add the cost of the additional Oracle software to plaintiff's proposal. This conclusion is consistent with the findings of the GAO. While the court is not bound by a determination of the GAO, the court may rely upon such a decision for general guidance to the extent it is reasonable and persuasive in light of the administrative record. *See Honeywell, Inc. v. United States,* 870 F.2d 644, 649 (Fed.Cir. 1989); *see also Bellevue Bus Serv., Inc. v. United States,* 15 Cl.Ct. 131, 134 n. 3 (1988).

### 2. *Discussions*

In the present case, plaintiff also argues that the discussions defendant held with plaintiff were inadequate. According to plaintiff, defendant was obligated to discuss with plaintiff its concern that plaintiff's proposal could not meet the performance requirements of the solicitation. Defendant and WDS contend that adequate and reasonable discussions were held between plaintiff and defendant.

In negotiated procurements, such as the procurement at issue here, the CO is required to conduct written or oral discussions with all responsible offerors who submit proposals within the competitive range. 48 C.F.R. § 15.610(b) (1996). "The content and extent of the discussions is a matter of the contracting officer's judgment, based upon the particular facts of each acquisition...."

*Id.; see also CACI,* 13 Cl.Ct. at 731; *Action Mfg. Co. v. United States,* 10 Cl.Ct. 474, 479 (1986) ("[T]he contracting officer has broad discretion when dealing with negotiations between the government and offerors."). In addition, 48 C.F.R. § 15.610(c) (1996), provides:

> The contracting officer shall-
>
> (1) Control all discussions;
>
> (2) Advise the offeror of deficiencies in its proposal so that the offeror is given an opportunity to satisfy the Government's requirements;
>
> (3) Attempt to resolve any uncertainties concerning the technical proposal and other terms and conditions of the proposal;
>
> (4) Resolve any suspected mistakes by calling them to the offeror's attention as specifically as possible without disclosing information concerning other offerors' proposals or the evaluation process...;
>
> (5) Provide the offeror an opportunity to submit any cost or price, technical, or other revisions to its proposal that may result from the discussions; and
>
> (6) Provide an offeror the opportunity to discuss past performance information obtained from references on which the offeror had not had a previous opportunity to comment. Names of individuals providing reference information about an offeror's past performance shall not be disclosed.

As previously noted, defendant's contention that plaintiff's proposal required multiple servers in order to meet the performance requirements of the solicitation was reasonable. Further, the contracting officials, in their broad discretion, determined that plaintiff's proposal required the additional Oracle software to operate with multiple servers. Defendant was not required to engage in discussions with plaintiff regarding issues which it reasonably found needed no further clarification. Defendant is only obligated to seek clarification from an offeror when a proposal contains an apparent deficiency or when an uncertainty concerning the technical proposal must be resolved. Section 15.610(c). Where defendant finds no such

---

**35.** *Id.*

deficiency or uncertainty, it is not obligated to carry on further discussions.

Moreover, defendant initiated discussions with plaintiff after the detailed evaluation. As part of those discussions, on July 19, 1996, the CO sent a letter to plaintiff outlining eighteen areas in plaintiff's proposal and OCD that required clarification. Among the requests for clarification sent to plaintiff was the question: "[w]hat does the offeror require the Government to have in place in order to implement its solution?"[36] In response, plaintiff stated that it expected defendant to furnish a "UNIX Server (or servers)."[37] This reply, by noting that UNIX servers may be required, indicates that plaintiff at least contemplated the possibility that multiple servers might be required to implement its proposal. Further, plaintiff responded that, should multiple servers be required, plaintiff's proposal would require the additional Oracle software.[38]

Defendant relied upon the responses provided by plaintiff during discussions that indicated the additional Oracle software would be required if multiple servers were used. Defendant reasonably concluded that plaintiff's solution required multiple servers. Thus, defendant was not obligated to carry on further discussions with plaintiff.[39]

### 3. Disparate treatment

In asserting that it received disparate treatment in the procurement process, plaintiff argues that, to the extent multiple servers were required for this solicitation, defendant was obligated to upwardly adjust WDS' proposal to include the cost of the additional Oracle software. Defendant and WDS assert that WDS' proposal did not warrant such an adjustment.

Plaintiff does not, nor can it, cite to any provision of the solicitation requiring defendant to apply the same cost realism adjustments to all offerors' proposals. Rather, the solicitation permits defendant to add discriminators, such as additional third-party software, to the proposals for which they are required. Discriminators are unique to each offeror's proposal.

Here, the contracting officials determined, in their broad discretion, that plaintiff's proposal was the only proposal requiring the additional Oracle software. Defendant has adequately explained that this finding was particular to plaintiff's proposal. As such, defendant added the cost of the additional Oracle software only to plaintiff's proposal.

### C. Violation of Statute or Regulation

Plaintiff alleges that defendant violated several statutes and regulations during the procurement process at issue here. See 10 U.S.C. §§ 2304(a)(1)(A), 2305(b), 2305(b)(4) (1994); 48 C.F.R. §§ 6.101, 15.608(a), 15.610 (1996). The statutes and regulations cited by plaintiff as having been violated by defendant relate to the implied contract that a procuring official consider all bids fairly. The above discussion, however, shows that defendant's actions did not constitute a breach of that implied contract. It is therefore axiomatic that defendant's actions did not violate any of the cited statutes or regulations.

Plaintiff has not demonstrated, by clear and convincing evidence, that defendant breached its implied contract to consider plaintiff's bid fairly and honestly. Specifically, plaintiff has -not shown, under the four-part standard set out by the court, that

---

**36.** Id., Tab 9B at 2.

**37.** Id., Tab 13B at 4.

**38.** Id.

**39.** Plaintiff further argues that, to the extent defendant relied on a customer reference to determine that plaintiff could not meet the performance requirement of the solicitation, defendant was obligated to apprise plaintiff of that reliance. In support of this argument, plaintiff cites to Section 15.610(c)(6). Plaintiff's reliance on that section, however, is misplaced. Section 15.610(c)(6) applies to situations where defen-

dant has obtained past performance information from references upon which plaintiff has not had an opportunity to comment. This section can reasonably read in conjunction with 48 C.F.R. § 15.608(2)(ii) (1996), which states that "[p]ast performance information may also be obtained from other sources known to the Government." This language indicates that defendant may obtain references from sources other than plaintiff upon which plaintiff has not had the opportunity to comment. Thus, Section 15.610(c)(6) cannot be interpreted to apply to a reference that plaintiff itself has provided.

defendant acted in an arbitrary and capricious manner in considering plaintiff's proposal. *See Keco,* 492 F.2d at 1203–04. The court grants defendant's motion for summary judgment and WDS' motion for summary judgment.

*Conclusion*

For the foregoing reasons, plaintiff's motion for summary judgment is denied, defendant's motion to dismiss is denied, defendant's motion for summary judgment is granted, and WDS' motion for summary judgment is granted. Accordingly, the Clerk is directed to dismiss plaintiff's complaint. No costs.