**AERO CORPORATION, S.A., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 97–416C.

United States Court of Federal Claims.

Aug. 18, 1997.

Robert J. Martinez, Washington, DC, for plaintiff. Barbara E. Wixon and Williams & Jensen, P.C., of counsel.

Joseph A. Kijewski, Department of Justice, Washington, DC, with whom was Assistant Attorney General Frank W. Hunger, for defendant. David M. Cohen, Director, Civil Division; and John E. Lariccia, Greg Petkoff, and Marian E. Sullivan, Department of the Air Force, Office of General Counsel, of counsel.

## OPINION

FUTEY, Judge.

This matter is presently before this court on the parties' cross-motions for summary judgement pursuant to RCFC 56, or alternatively for judgment upon the administrative record pursuant to RCFC 56.1.[1] Plaintiff initiated this action after its proposal submitted in response to defendant's solicitation was excluded from the competitive range by defendant.[2] Plaintiff argues that its proposal was improperly eliminated from the competitive range because defendant's determinations regarding plaintiff's proposal lack a reasonable basis, and defendant's evaluation of plaintiff's proposal was conducted in violation of applicable law and regulations. Based upon these allegations, plaintiff seeks to enjoin defendant from proceeding to an award upon the solicitation without first reinstating plaintiff's proposal into the competition.

Based upon the alleged improprieties, plaintiff also requests award of its bid preparation costs. Defendant responds that a reasonable basis exists for its decision to exclude plaintiff's proposal from the competitive range and plaintiff's proposal was neither unfairly nor unlawfully evaluated. Defendant therefore asserts that judgment for defendant is proper as a matter law.

### Factual Background

In response to the mandate of the Base Closure and Realignment Commission that the San Antonio Air Logistics Center (San Antonio ALC) workload, located at Kelly Air Force Base, Texas (Kelly AFB), be transferred, defendant, acting through the Department of the Air Force, announced its plan to conduct a public/private sector competition to determine the manner in which the transfer should occur. Accordingly, on February 11, 1997, defendant issued Solicitation No. F41608–96–R–0254 (the solicitation). The specific purpose of the solicitation is "to determine whether the C–5 depot maintenance activity currently performed at the San Antonio [ALC] should be privatized or transferred to another public depot for performance."[3] The solicitation contemplates award of a fixed-price requirements contract, with economic price adjustment and award fee, for a seven-year term.[4]

The solicitation advises each potential offeror that:

> [a.] The offeror's proposal must include all data and information requested by the [Instructions to Offerors] and must be submitted in accordance with these instructions. The offeror shall be compliant with the requirements as stated in the Technical Requirements Document ..., Contract Data Requirements List ... and Model Contract/[Request for Proposals].

---

1. Consistent with their titles, the parties' cross-motions will hereinafter be referred to as cross-motions for summary judgment.

2. The court is vested with the authority to consider plaintiff's pre-award bid protest pursuant to the Tucker Act, 28 U.S.C. § 1491(b) (1994), *as amended by* Administrative Dispute Resolution Act of 1996, Pub.L. No. 104–320, 110 Stat. 3870, 3874–75 (1996).

3. Administrative Record (A.R.), tab 14, at unnumbered page 1. The C–5 Galaxy is a heavy cargo transport aircraft. *See* Defendant's Opposition to Plaintiff's Application for a Temporary Restraining Order and Motion for Preliminary Injunction, Attachment ¶ 6.

4. A.R., tab 14, at 2.

b. The proposal shall be clear, concise, and shall include sufficient detail for effective evaluation and for substantiating the validity of stated claims. Offerors shall assume that the Government has no prior knowledge of their facilities and experience, and will base its evaluation on the information presented in the offeror's proposal.[5]

The solicitation also specifies that proposals would be evaluated for their understanding of and compliance with the requirements of the solicitation, as well as the soundness of their approach under five evaluation factors within the management area. These factors include: (1) transition; (2) production operations; (3) corporate operations; (4) logistics support; and (5) source of repair qualifications. Each of these five factors would be given two ratings.[6]

The first rating, a color/adjectival rating, depicts how well each portion of the offeror's proposal complies with the solicitation requirements and evaluation standards.[7] Four categories of color/adjectival ratings are set out in Air Force FAR Supplement (AFFARS), Appendix AA, Source Selection Procedures for Major Acquisitions,[8] which is incorporated as part of the solicitation.[9] Two of these ratings, red and yellow, are relevant for purposes of this opinion. A red marking signifies an area that is unacceptable because it "[f]ails to meet a minimum requirement of the [solicitation] and the deficiency is uncorrectable without a major revision of the proposal." [10] A yellow marking denotes an area that is marginal because, although it "[f]ails to meet evaluation standards ... any significant deficiencies are correctable." [11]

The second rating, a proposal risk rating, reflects the risk associated with each portion of the offeror's proposal.[12] The standard AFFARS Appendix AA proposal risk ratings were to be utilized in the proposal risk assessment of each portion of an offeror's proposal.[13] The proposal risk ratings of low, moderate, and high address the potential for disruption that may be caused by a given deficiency, as well as the degree of government monitoring that would be required in order to overcome difficulties associated therewith.[14]

Under the terms of the solicitation, defendant also reserved its right to eliminate a proposal from the competitive range.[15] A proposal could be excluded from the competitive range based upon: (1) an unrealistic cost or price; (2) evidence that an offeror does not understand the requirement; or (3) major technical or business deficiencies, or omissions, that cannot reasonably be cured through discussions with the offeror.[16]

The solicitation established April 14, 1997, as the final date for submission of proposals.[17] Plaintiff's proposal was received by defendant on that date. Over the course of the following several weeks, defendant conducted an evaluation of each offeror's proposal. The evaluation methods were to conform to AFFARS Appendix AA and Supplements.[18] The overall source selection process, including the evaluation portion of the process, is defined in the "C–5 Business Area Source Selection Evaluation Guide" (the Source Selection Evaluation Guide).

According to the Source Selection Evaluation Guide, the individual evaluators were to

---

5. *Id.,* tab 14, cl. L–900, ¶ 2. 1(a)-(b), at 19.

6. *Id.,* tab 14, cl. M–900, ¶ 5.1, at 28.

7. *Id.*

8. *Id.,* tab 21, at AA–15.

9. *Id.,* tab 14, cl. M–900, ¶ 2.3, at 25.

10. *Id.,* tab 11, at 17; *see also id.,* tab 14, cl. M–900, ¶ 2.3, at 26.

11. *Id.,* tab 11, at 17; *see also id.,* tab 14, cl. M–900, ¶ 2.3, at 26.

12. *Id.,* tab 14, cl. M–900, ¶ 5.1, at 28.

13. *Id.,* tab 11, at 19; *see also id.,* tab 14, cl. M–900, ¶ 2.3, at 26.

14. *Id.,* tab 11, at 19; *see also id.,* tab 14, cl. M–900, ¶ 2.3, at 26; *id.,* tab 21, at AA–16.

15. *Id.,* tab 14, cl. M–900, ¶ 3.1, at 25–26.

16. *Id.,* tab 14, cl. M–900, ¶ 3.1, at 26.

17. *Id.,* tab 14, at unnumbered page 1.

18. *Id.,* tab 11, ¶ 5.1, at 14.

assign ratings for their respective areas in each proposal and comment upon the strengths and weaknesses of each area.[19] These evaluators also were to draft clarification requests (CRs) and deficiency reports (DRs) for each proposal.[20] The evaluations, CRs, and DRs then were to be discussed by the entire evaluation team, which was to compile a report on the strengths and weaknesses of each offeror's proposal.[21] With respect to the present procurement, evaluations were completed, and CRs and DRs were drafted by the evaluators. The evaluators' findings were discussed by the evaluation team, which produced its report.

The results of the initial evaluation were then presented by the Source Selection Evaluation Board to the Source Selection Advisory Council in a briefing held on May 13, 1997.[22] The briefing charts were revised and presented to the Source Selection Authority (SSA) in the Competitive Range Briefing (SSA briefing) on May 15, 1997. Following the briefing, the contracting officer determined that plaintiff's proposal failed to adequately address the requirements of the solicitation and did not have a reasonable chance of award. On May 20, 1997, the SSA approved this determination.

By letter dated May 21, 1997, defendant's contracting officer notified plaintiff that its proposal had been eliminated from the competitive range. Included with the letter was a "Competitive Range Determination," which provided the basis for the SSA's decision to exclude plaintiff's proposal. Generally, the SSA concluded that plaintiff's proposal failed to "adequately address the essential requirements of the solicitation." [23] In that regard, the SSA identified the following six areas as being deficient: (1) transition; (2) production operations; (3) corporate operations; (4) logistics support; (5) source of repair; and (6) cost.

Plaintiff received a debriefing from defendant regarding its disqualification on June 4, 1997. During the debriefing, defendant gave a slide presentation that identified the allegedly deficient technical areas in plaintiff's proposal with either a red or a yellow marking. Of the technical areas identified by defendant as deficient, three were given red markings and two were given yellow markings. Specifically, the following ratings were assigned to plaintiff's proposal: (1) "Red–High" for transition; (2) "Red–High" for production operations; (3) "Red–High" for corporate operations; (4) "Yellow–Moderate" for logistics support; and (5) "Yellow–High" for source of repair qualifications. In addition, the SSA deemed plaintiff's cost proposal to be unrealistic and incomplete, and found that it posed a high risk to performance.

According to plaintiff, defendant indicated during the debriefing that the three technical areas with red markings, along with plaintiff's cost proposal, were the elements of the evaluation that supported defendant's decision to exclude plaintiff's proposal from the competitive range. Plaintiff also alleges that defendant acknowledged during the debriefing that the two technical areas with yellow markings were not valid bases for plaintiff's exclusion from the competitive range. Defendant maintains that its decision to exclude plaintiff's proposal is based upon its complete evaluation of the proposal, including the areas given yellow markings.

Arguing that defendant acted improperly in deciding to exclude plaintiff's proposal from the competitive range, plaintiff filed an application for a temporary restraining order and motion for preliminary injunction with the court on June 12, 1997. On the same date, plaintiff also filed a complaint seeking injunctive and declaratory relief, as well as recovery of its bid preparation costs.

On June 17, 1997, this court heard oral argument on plaintiff's application for a temporary restraining order and motion for preliminary injunction. By opinion and order dated June 20, 1997, this court denied plaintiff's request for injunctive relief. Accordingly, defendant has been proceeding with all

---

19. *Id.,* tab 11, at 14–16.

20. *Id.,* tab 11, ¶¶ 5.2.2.5, 5.2.2.6, at 16.

21. *Id.,* tab 11, at 17–18.

22. For a flow chart of the C–5 source selection process and structure, see *id.,* tab 11, at 23.

23. *Id.,* tab 3, at 1.

aspects of this procurement short of contract award. With respect to contract award, counsel for defendant has assured this court that no award will be made prior to the issuance of the court's decision on the merits of plaintiff's claim.[24]

This court next considered plaintiff's motion to compel discovery and defendant's opposition thereto. By opinion and order dated July 8, 1997, this court granted plaintiff's motion in part and denied it in part. Limited discovery was ordered to proceed immediately, in the nature of deposition testimony from Ms. Darlene A. Druyun, the Source Selection Authority on this procurement, and Ms. Jessie M. Simpson, the contracting officer on this procurement. This court denied plaintiff's request for discovery of an unredacted copy of the SSA briefing. Due to an inadvertent disclosure by defendant, however, information contained in the unredacted SSA briefing subsequently was made available to plaintiff's counsel.[25]

Based upon the information inadvertently disclosed by defendant, plaintiff filed an amended complaint on July 11, 1997. In its amended complaint, plaintiff raises new allegations of improprieties, including statutory and regulatory violations, on the part of defendant's contracting officials during the conduct of this procurement.

This court's opinion and order of July 8, 1997, further directed the parties to file cross-motions for summary judgment by July 16, 1997. In accordance with the order, defendant filed its motion for summary judgment, or alternatively its motion for judgment upon the administrative record, on that date. Plaintiff filed its motion for summary judgment on July 17, 1997, with the leave of this court. On July 18, 1997, each of the parties filed its response to the other party's motion for summary judgment. At the direction of this court, the parties filed a joint stipulation of material facts on July 21, 1997. This court heard oral argument on the parties' cross-motions for summary judgment on July 23, 1997.

*Discussion*

Plaintiff asserts that defendant improperly excluded plaintiff's proposal from the competitive range. In that regard, plaintiff contends that defendant's decision was arbitrary and capricious, lacked a reasonable basis, and was in violation of the terms of the solicitation and applicable law. Plaintiff raises a number of arguments in support of these broad allegations.

First, plaintiff argues that defendant's determination is arbitrary and capricious, and lacks a reasonable basis, because defendant relied in its decision upon numerous facts that are unsupported in the record. In its briefings and argument before this court, plaintiff cites several examples in support of this claim. Defendant responds that its decision has a reasonable basis in the record and is factually correct.

Similarly, plaintiff alleges that defendant, in eliminating plaintiff's proposal from the competitive range, improperly relied upon two alleged areas of deficiency that did not rise to the level of serious defects. Specifically, plaintiff notes that two of the six alleged areas of deficiency raised by defendant were given yellow markings and should have been correctable. As such, plaintiff contends that these two areas, logistics support and source of repair qualifications, should not be considered as valid bases for defendant's elimination of plaintiff's proposal from the competitive range. In response, defendant argues that its decision to exclude plaintiff's proposal from the competitive range was based upon a complete review of plaintiff's proposal and all of its alleged deficiencies. Defendant therefore presents the two areas with yellow markings as further support for the reasonableness of its ultimate determination to exclude plaintiff's proposal from the competitive range.

24. Transcript of oral argument on plaintiff's application for a temporary restraining order and motion for preliminary injunction at 14, 43.

25. Plaintiff describes the nature of the disclosures as "ineffective black marker redaction" of the SSA briefing. Plaintiff's Motion to Supplement the Administrative Record and Request for Expedited Treatment at 2. By an order of this court dated July 16, 1997, an unredacted copy of the SSA briefing was designated as tab 4a of the administrative record.

Indeed, the relevant regulations direct that a competitive range determination is to be made based upon the consideration of an offeror's proposal as a whole. *See* 48 C.F.R. § 15.609 (1996) (FAR 15.609). Moreover, defendant was not prohibited from relying upon such additional factors in its overall competitive range determination. *See* AFFARS App. AA–311(c). Thus, this court also considers the reasonableness of defendant's findings regarding the two factors in plaintiff's proposal that were given yellow markings.

Plaintiff further contends that defendant's decision is based upon misstated or misapplied solicitation requirements. According to plaintiff, this allegation raises the question of whether defendant's contracting officials even understood the requirements. In the same vein, plaintiff asserts that defendant's conclusions indicate a lack of understanding of the legal requirements for and significance of exclusion from the competitive range. Further, plaintiff alleges that defendant's misreading of and failure to recognize entire sections of plaintiff's proposal calls into question whether defendant thoroughly and completely reviewed plaintiff's proposal. This court addresses plaintiff's claims as they arise in the context of plaintiff's specific arguments as to each segment of the evaluation process.

Plaintiff also presents several arguments to this court alleging violations of applicable statutes and regulations. First, plaintiff vaguely raises claims involving the Competition in Contracting Act (CICA), Pub.L. No. 98–369, 98 Stat. 1175 (1984) (codified as amended in scattered sections of U.S.C.). Next, plaintiff asserts that its proposal received disparate treatment from defendant during the evaluation process. In that regard, plaintiff contends that, while its proposal was excluded, other offerors' proposals with similar alleged deficiencies remained within the competitive range. Additionally, plaintiff alleges that defendant, in making its competitive range determination, improperly compared plaintiff's proposal to the proposals of other offerors.

## I. Summary Judgment

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56; *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). A fact is considered material if it might significantly affect the outcome of the suit under the governing law. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. The party moving for summary judgment bears the initial burden of demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). If the moving party demonstrates an absence of genuine issues of material fact, the burden then shifts to the non-moving party to show that a genuine factual dispute exists. *Sweats Fashions, Inc. v. Pannill Knitting Co.,* 833 F.2d 1560, 1563 (Fed.Cir.1987). Alternatively, if the moving party shows an absence of evidence to support the non-moving party's case, the burden shifts to the non-moving party to proffer such evidence. *Celotex,* 477 U.S. at 325, 106 S.Ct. at 2553–54.

The court must resolve any doubts about factual issues in favor of the non-moving party, *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.,* 755 F.2d 158, 163 (Fed.Cir.1985), to whom the benefits of all presumptions and inferences run. *H.F. Allen Orchards v. United States,* 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied,* 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985). Further, in cases such as the present one where the parties have submitted cross-motions for summary judgment, the court must evaluate each party's motion on its own merit and resolve all reasonable inferences against the party whose motion is under consideration. *A Olympic Forwarder, Inc. v. United States,* 33 Fed. Cl. 514, 518 (1995) (citing *Corman,* 26 Cl.Ct. at 1014). This court applies these standards in considering the parties' cross-motions for summary judgment.[26]

26. Alternatively, defendant presents its motion as a motion for judgment upon the administrative record under RCFC 56.1. Under either alternative, the standard to be applied by the court is the same because motions for judgment upon the administrative record are treated in accordance

## II. Scope of Review

Plaintiff contends that the SSA's determination must "stand or fall on its own terms."[27] In that regard, plaintiff insists that "only issues cited and relied upon by the SSA can be used to provide a rational basis for [her decision to exclude plaintiff's proposal from the competitive range]."[28] Thus, plaintiff argues that this court must limit its examination of the record simply to those parts of the record that directly address the issues cited in the SSA's determination. Defendant, however, asserts that this court must judge the propriety of the SSA's determination based upon the entire record made and decide whether her decision is sustainable on that record.

■ Contrary to plaintiff's attestations, case law shows that the court is to look to "the 'whole record' before [defendant]; that is, all the material that was developed and considered by [defendant] in making its decision." *Cubic Applications, Inc. v. United States,* 37 Fed. Cl. 339, 342 (1997) (quoting *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973)). Further, it is clear that the record to be considered by the court "must naturally include all materials upon which [defendant] relied." *Id.* Indeed, case law dictates that the record to be considered by this court is the full record that was before the SSA at the time the decision was made. *Hedman v. United States,* 15 Cl.Ct. 304, 321 (1988), *aff'd,* 915 F.2d 1552 (Fed.Cir.1990).

In addition, as defendant's counsel indicated during oral argument, it would be "a ridiculous burden" to require defendant to produce exhaustive documents outlining every defect in every allegedly deficient proposal submitted in response to every government solicitation.[29] Rather, the government specifically establishes procedures for the conduct of procurements under which many documents may be produced and upon which defendant should be permitted to rely in the decision-making process. With respect to the present procurement, the Source Selection Evaluation Guide specifically sets out this process. Accordingly, this court reviews plaintiff's challenge based upon the whole record that was before the SSA at the time of her decision to exclude plaintiff's proposal from the competitive range.

## III. Declaratory and Monetary Relief

■ Whenever defendant solicits bids, an implied-in-fact contract is created between defendant and the bidders on the underlying contract. *Ingersoll–Rand Co. v. United States,* 2 Cl.Ct. 373, 375 (1983). Under this implied-in-fact contract, the government guarantees that it will fully and fairly consider all bids submitted in accordance with the solicitation. *E.W. Bliss Co. v. United States,* 77 F.3d 445, 447 (Fed.Cir.1996); *see also Cincom Sys., Inc. v. United States,* 37 Fed. Cl. 663, 671 (1997); *Ingersoll–Rand,* 2 Cl.Ct. at 375. "It is this implied contract which forms the jurisdictional basis for an exercise of this court's equitable authority." *Ingersoll–Rand,* 2 Cl.Ct. at 375; *see also Keco Indus., Inc. v. United States,* 192 Ct.Cl. 773, 428 F.2d 1233, 1237 (1970). Thus, the court's authority to grant relief is limited to determining whether the government breached its implied contract of fair dealing with the complaining bidder. *Cincom,* 37 Fed. Cl. at 671; *see also Central Ark. Maintenance, Inc. v. United States,* 68 F.3d 1338, 1341–42 (Fed. Cir.1995); *United States v. John C. Grimberg Co.,* 702 F.2d 1362, 1373 (Fed.Cir.1983). Further, the court's review of an agency's procurement decision is limited in scope. *Shields Enters. v. United States,* 28 Fed. Cl. 615, 622 (1993). Indeed, "[i]t is through a narrow lens that this court is charged with determining whether the government has satisfied the implied contractual condition

---

with the rules governing motions for summary judgment. *Id.; see also Nickerson v. United States,* 35 Fed. Cl. 581, 588 (1996) (setting out this standard), *aff'd,* 113 F.3d 1255 (Fed.Cir. 1997); *Clifton v. United States,* 31 Fed. Cl. 593, 596 (1994) (stating that, because the parties relied upon the administrative record, the motion under consideration implicated summary judgment), *aff'd,* 66 F.3d 345 (Fed.Cir.1995).

**27.** Plaintiff's Response to Defendant's Motion for Summary Judgment (Pl.'s Resp.) at 3.

**28.** *Id.* at 4.

**29.** Transcript of oral argument on the parties' cross-motions for summary judgment (Tr.) at 83.

that each offer received by the government in response to a request for proposals will be fairly and honestly evaluated." *Id.* Moreover, the court is to accord deference to agency procurement decisions. *Id.* In making this determination, this court "will, of course, take care to assure that it does not 'substitute its judgment for that of [defendant].'" *Hedman,* 15 Cl.Ct. at 321 (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971)).

■ It is within these parameters that this court must decide whether plaintiff has shown, by clear and convincing evidence, that defendant's actions toward plaintiff were arbitrary and capricious such that defendant breached its implied duty of fair dealing with plaintiff. *See Compubahn, Inc. v. United States,* 33 Fed. Cl. 677, 681–82 (1995) (noting arbitrary and capricious standard); *Finley v. United States,* 31 Fed. Cl. 704, 706 (1994) (same), *appeal dismissed,* 50 F.3d 21 (Fed. Cir.1995); *see also 126 Northpoint Plaza Ltd. Partnership v. United States,* 34 Fed. Cl. 105, 107 (stating that plaintiff bears the burden of proving the breach by clear and convincing evidence), *appeal dismissed,* 73 F.3d 379 (Fed.Cir.1995); *see also Baird Corp. v. United States,* 1 Cl.Ct. 662, 664 (1983) (same). In making that determination, this court must consider four factors: (1) whether there was bad faith on the part of defendant's procurement officials that deprived plaintiff of fair consideration; (2) whether there was a reasonable basis for defendant's procurement decisions; (3) whether defendant's procurement officials abused their discretion; and (4) whether defendant's procurement officials violated pertinent statutes or regulations. *Keco Indus., Inc. v. United States,* 203 Ct.Cl. 566, 492 F.2d 1200, 1203–04 (1974) (*Keco II* ), *cited in Compubahn,* 33 Fed. Cl. at 682; *Finley,* 31 Fed. Cl. at 706; *cf. 126 Northpoint,* 34 Fed. Cl. at 107 (stating that the plaintiff must show that either the contracting official's decision lacked a rational or reasonable basis, or the procurement process violated applica-

ble statutes and regulations); *Y.S.K. Constr. Co. v. United States,* 30 Fed. Cl. 449, 454–55 (1994) (declaring that the court may find a breach only if defendant's actions were arbitrary and capricious, or constituted a clear and prejudicial statutory or regulatory violation).

## A. *Bad Faith*

■ In reviewing government procurement decisions, "there is a strong presumption that government officials act properly and in good faith." *Finley,* 31 Fed. Cl. at 706; *see also Alaska Airlines, Inc. v. Johnson,* 8 F.3d 791, 795 (Fed.Cir.1993) (noting that agency employees are presumed to do their jobs properly). In the present case, plaintiff insists that it is not alleging bad faith on the part of defendant's procuring officials.[30] Plaintiff contends, however, that certain alleged problems in the conduct of the procurement "defeat any presumption of regularity in this process."[31] Although plaintiff maintains that it is charging only that mistakes were made, plaintiff's assertions at least imply some degree of impropriety on the part of defendant's contracting officials. As such, this court considers whether these officials acted in bad faith in their evaluation of plaintiff's proposal.

■ This court initially notes that plaintiff's charge that the procurement process contains "sloppy elements"[32] is insufficient to rebut the presumption that defendant's contracting officials acted properly and in good faith in the discharge of their duties. *See Finley,* 31 Fed. Cl. at 706. The presumption also is not rebutted where plaintiff simply disagrees with the manner in which defendant considered its proposal. *See id.* (indicating that disagreement does not equal bad faith). Moreover, plaintiff has not demonstrated that defendant acted with a specific intent to injure plaintiff during the competitive range evaluation process. *See Contract Custom Drapery Serv., Inc. v. United States,* 6 Cl.Ct. 811, 817 (1984), *aff'd,* 785 F.2d 321 (Fed.Cir.1985). This court therefore concludes that defendant's con-

---

**30.** *Id.* at 61.

**31.** *Id.* at 60.

**32.** *Id.*

tracting officials did not act in bad faith in deciding to exclude plaintiff's proposal from the competitive range.

## B. Reasonable Basis and Discretion [33]

 It is well-settled that "a contractor is never assured that it will receive an award and the government retains discretion to reject all bids without liability." *126 Northpoint,* 34 Fed. Cl. at 107; *see also* 48 C.F.R. § 15.608(b) (1996). Moreover, because defendant's contracting officials may exercise broad discretion in procurement decisions, the court's review of these officials' actions is limited.[34] *CACI Field Servs., Inc. v. United States,* 13 Cl.Ct. 718, 725 (1987), *aff'd,* 854 F.2d 464 (Fed.Cir.1988); *see also Electro–Methods, Inc. v. United States,* 7 Cl.Ct. 755, 762 (1985). Indeed, the court should not intervene in the contract-award process unless it can determine that the decision at issue was irrational or unreasonable. *CACI,* 13 Cl.Ct. at 725; *see also Isometrics, Inc. v. United States,* 11 Cl.Ct. 346, 349 (1986). Thus, in order to prevail in the present case, plaintiff must show that there was no reasonable basis for defendant's actions. *Keco II,* 492 F.2d at 1205.

 "Because the principle of action 'without any reasonable basis' is closely related to the bad faith test, [where, as here, no bad faith exists] it is highly unlikely the conduct of [defendant] can be said to have had 'no reasonable basis.'" *Burroughs Corp. v. United States,* 223 Ct.Cl. 53, 617 F.2d 590, 597 (1980). The unlikelihood of such a determination is increased due to the breadth of latitude afforded contracting officials in making procurement-related decisions. *Shields,* 28 Fed. Cl. at 625. This discretion extends to the manner in which contracting officials may evaluate bids and apply procurement regulations. *Electro–Methods,* 7 Cl.Ct. at 762. Nevertheless, in light of the serious allegations made by plain-tiff, this court considers the reasonableness of the determinations underlying defendant's decision to exclude plaintiff's proposal from the competitive range.

### 1. Transition

As previously noted, defendant assigned a "Red–High" rating to the transition portion of plaintiff's proposal. Plaintiff alleges that several of defendant's conclusions used to support that rating reflect serious error. Consequently, plaintiff contends that the "Red–High" rating for this factor lacks a reasonable basis.

#### a. Transition Experience

 First, plaintiff challenges defendant's determination that plaintiff's proposal failed to provide evidence of the required transition experience.[35] Plaintiff maintains that its proposal contains detailed information regarding its transition experience and an explanation as to why such experience is applicable to the solicitation. As plaintiff notes, DR 111 acknowledges that plaintiff's proposal provides evidence of plaintiff's transition experience.[36] DR 111 further states, however, that plaintiff's proposal is still deficient in this area because plaintiff's experience is not of the magnitude of the C–5 transition and does not include take-over of work in progress.[37]

In plaintiff's view, neither the solicitation nor the Source Selection Evaluation Guide requires experience with work in progress. The solicitation, however, requires offerors to demonstrate experience with "at least one similar workload transition as proposed in [the transition integration plan]." [38] In accordance with the solicitation, plaintiff submitted a transition integration plan spanning the date of contract award through the conclusion of the w k in progress. Thus, inherent in plaintiff's bid is an understanding that the transition period would include comple-

---

**33.** "Criteria two and three are most logically addressed together." *Compubahn,* 33 Fed. Cl. at 682.

**34.** This discretion is especially broad in negotiated procurements, such as the one involved in the present case. *Logicon, Inc. v. United States,* 22 Cl.Ct. 776, 782 (1991).

**35.** A.R., tab 4, at 40.

**36.** *Id.,* tab 6, at 8.

**37.** *Id.*

**38.** *Id.,* tab 14, cl. M–900, ¶ 6.0, at 28.

tion of the work in progress. As evidenced by the interpretation of the solicitation used by plaintiff in its proposal, experience with work in progress is an implicit solicitation requirement. Moreover, although plaintiff proposed to transition a work in progress workload in its transition integration plan, plaintiff failed to demonstrate similar transition experience as required by the solicitation. Defendant's determinations with respect to this element of plaintiff's proposal are therefore reasonably-based.

Further, one of the concerns expressed by the evaluators with regard to this factor is the finding that plaintiff's proposal fails to show that plaintiff's listed transition experience is of a similar complexity to the C–5 maintenance workload. Notably, the evaluators concluded that the experience examples provided by plaintiff are properly classified as "start up" work rather than transition workload as required by the solicitation.[39] Such determinations are appropriately left to the discretion of defendant's contracting officials. Absent a clear showing of impropriety, this court will not interfere with such decisions.

### b. *Material Requirements*

██ Next, defendant determined that plaintiff's proposal lacks a clear definition of material requirements. Plaintiff maintains that its proposal contains such information and contests defendant's assertions to the contrary. Plaintiff further asserts that defendant's conclusions in this area are based solely upon DR 96.

With respect to the material requirement deficiencies noted in DR 96, plaintiff asserts that the citation in DR 96 to only one part of plaintiff's proposal indicates that the evaluator failed to examine "any of the other areas where [plaintiff] addressed [transition integration plan] material requirements."[40] Such a conclusion is, however, purely speculative. Such speculation, without more, is insufficient to rebut the presumption that the evaluators acted properly and considered plaintiff's proposal in its entirety. *See Finley*, 31 Fed. Cl. at 706 (noting that plaintiff bears the burden to rebut this presumption by clear and convincing evidence). Furthermore, the record itself provides clear evidence that defendant's evaluators reviewed more than just the one section of plaintiff's proposal referenced in DR 96, thereby refuting plaintiff's claim that defendant's evaluators considered only that one section.[41]

In fact, the record shows that three of defendant's evaluators commented on the material requirements portion of plaintiff's proposal,[42] and that two weaknesses were reported.[43] These comments and reported weaknesses provide supplemental support for the reasonableness of defendant's determination regarding this portion of plaintiff's proposal. Such a conclusion is especially valid in light of the SSA's statement that she reviewed all of these evaluation documents prior to rendering her determination excluding plaintiff's proposal from the competitive range.[44]

Moreover, plaintiff fails to address, much less provide clear and convincing evidence to refute, defendant's finding that plaintiff's proposal refers to, but does not identify, the best commercial practices plaintiff proposed to utilize to enhance the supply system.[45] Nor does plaintiff contest defendant's finding that plaintiff's proposal fails to indicate how plaintiff would meet critical parts shortages or interface with existing supply in order to satisfy the aggressive transition schedule

---

**39.** *Id.*, tab 9, at 9–10; *see also id.*, tab 7, at 5.

**40.** Plaintiff's Brief in Support of Motion for Summary Judgment (Amended) (Pl.'s Mot.) at 9.

**41.** *See* A.R., tab 9, at 2–4 (demonstrating that at least several additional sections of plaintiff's proposal were reviewed with regard to the matter of material availability).

**42.** *Id.* (including comments on the material requirements standard in the solicitation, Standard 1.1.5.2).

**43.** *Id.*, tab 8, at 1–2.

**44.** Declaration of Darlene A. Druyun (Druyun Dep.) ¶¶ 8, 11, 12.

**45.** A.R., tab 6, at 29; *Id.*, tab 7 at 2; *Id.*, tab 9 at 4; *see also id.*, tab 12, vol. IIC, ¶ 1.3, at IIC–1–2 (citing to vol. IIA, ¶ 4.2, at IIA–4–7 to –9).

that it proposed.[46] These omissions provide further support for the reasonableness of defendant's decision regarding this element of plaintiff's proposal.

### c. *Personnel Requirements*

■ Like its findings concerning material requirements, defendant also concluded that plaintiff's proposal lacks a clear definition of personnel requirements. Again, plaintiff contends that its proposal contains such information and challenges defendant's evaluators' questioning of plaintiff's task duration and efficiency estimates. Specifically, plaintiff argues that its proposal provides a thorough explanation of the process by which its labor estimates were reached, a detailed training plan to meet those estimates, and a contingency plan should those efforts fail. According to plaintiff, the evaluators' questions in this area should have been presented during pre-best-and-final-offer discussions and should not have served as a basis for the exclusion of plaintiff's proposal from the competitive range.

As part of its determination that plaintiff's proposal lacks a clear definition of personnel requirements, defendant found that the proposal fails to adequately describe its efforts to ensure that a qualified work force would be available.[47] In its proposal, plaintiff states that it planned to employ a multi-skilled work force while at the same time giving preference to current Kelly AFB employees.[48] In fact, plaintiff's proposal indicates that 75% of its work force would be comprised of current Kelly AFB employees.[49] Many current Kelly AFB employees, however, are not multi-skilled.[50] Defendant's evaluators therefore reasonably concluded that plaintiff's intended preference for current Kelly AFB employees conflicted with its plan to use a multi-skilled work force.[51]

Additionally, although plaintiff planned to provide on-the-job training for current Kelly AFB employees, the evaluators found that plaintiff's proposal fails to explain "how and when" such training would occur.[52] As such, it was reasonable for the evaluators to be concerned that these employees would not be multi-skilled at the beginning of the transition period as indicated by plaintiff's proposed staffing schedule. Plaintiff does not cite this court to any portion of its proposal that would allay these concerns.

Plaintiff also contends that its hiring plan is fully explained in its proposal. Defendant's evaluation team, by contrast, found that plaintiff's plan indicates that several new hires during the first thirty days would be current Kelly AFB employees, but fails to specifically identify the source of the new hires or the "personnel holes created in the Kelly [AFB work in progress] when those people move."[53] Although plaintiff's proposal does discuss many aspects of its hiring plan, certain factors such as these potential "personnel holes" are not addressed. It therefore was reasonable for defendant's contracting officials, in their discretion, to conclude that this omission presented a significant risk to ongoing production and plaintiff's proposed transition plan.

Defendant also found plaintiff's proposal to be internally inconsistent concerning the number of personnel plaintiff proposed to have at a given point in the transition.[54] Due to these inconsistencies, defendant contends that its evaluators were unable to determine if plaintiff was offering the personnel resources necessary to conduct the transition.[55] Plaintiff provides no argument to contradict the reasonableness of this assertion. This failure reinforces this court's determination that plaintiff has not shown, by clear and convincing evidence, that defendant's find-

**46.** *Id.*, tab 8, at 2.

**47.** *Id.*, tab 7, at 26.

**48.** *Id.*, tab 12, vol. IIA, ¶ 1.1.1, at IIA–1–7; *see also id.*, vol. I, tbl. 2–1, at I 1–2.

**49.** *Id.*, vol. IIA, ¶ 1.1.1, at IIA–1–7.

**50.** *Id.*, tab 9, at 6.

**51.** *Id.*

**52.** *Id.*, tab 7, at 7; *see also id.*, tab 12, vol. IIA, ¶ 1.1.1, at IIA–1–7.

**53.** *Id.*, tab 9, at 10; *see also id.*, tab 7, at 6.

**54.** *See id.*, tab 7, at 2.

**55.** *Id.*

ings as to the personnel requirements portion of plaintiff's proposal lack a reasonable basis.

#### d. *Unrealistic Transition Plan*

 Several of defendant's findings regarding the lack of clear definition as to material and personnel requirements, which this court has already determined to be reasonably-based, are equally applicable with respect to defendant's conclusion that plaintiff's proposal contemplates an unrealistic transition plan.[56] Plaintiff, however, maintains that its transition integration plan proposes a detailed analysis outlining a realistic transition schedule. In support of its position, plaintiff asserts that defendant's evaluators initially gave plaintiff's transition integration plan a favorable rating, but that their rating was later contradicted by the technical team lead, Mr. Dan Bowman. Plaintiff asserts that "this contradictory evidence leaves the ultimate finding without a reasonable basis." [57]

Plaintiff states that "the record contains no evidence as for the reason why Mr. Bowman['s] evaluation completely disagrees with that of [the evaluators,] Mr. Snapp and Mr. LeDon." [58] This court's review of the record, however, reveals that plaintiff's contention is somewhat overstated. Mr. Bowman determined that several "short-falls of [plaintiff's] transition timeline equate to a poorly substantiated, ambitious, marginally credible and high risk transition approach." [59] While it is true that Mr. Snapp gave plaintiff's proposal a strength rating for a detailed timeline, he also indicated that the timeline contained "some holes ... inconsistencies ... and inadequately planned actions." [60] Nevertheless, he concluded that "with some *close monitoring,* [plaintiff's transition integration plan] milestones *seem* achievable." [61]

This conclusion is, however, far from the "clear picture" [62] that plaintiff asserts was found by the initial evaluators. Thus, plaintiff's allegation that Mr. Bowman's evaluation "completely disagrees" with that of the evaluators is not entirely accurate.

Furthermore, Mr. Bowman concluded that plaintiff's transition timeline proposes key operational changes that could not be realized until the number of aircraft in maintenance was reduced, which was not to occur until plaintiff's proposed transition period was almost complete.[63] Given the many reasonable concerns expressed by Mr. Bowman, as well as his careful references to the relevant portion of plaintiff's proposal, this court will not interfere with his conclusions. Indeed, the risk rating to be assigned to a proposal in such circumstances is most appropriately left to the discretion of defendant's contracting officials who have special expertise regarding the technical requirements of a particular procurement. As defendant pointed out during oral argument, as head of the technical evaluation team, Mr. Bowman possessed the requisite expertise and therefore was qualified to make such decisions.[64] In fact, the Source Selection Evaluation Guide expressly provides that the technical team lead is to determine "final strong/weak points, color ratings, proposal risk ratings, and required DRs and CRs." [65] This direct mandate lends additional support to this court's conclusion that Mr. Bowman acted properly and within his discretion in rating the technical portion of plaintiff's proposal.

In addition to the above-mentioned deficiencies regarding the adequacy of plaintiff's transition integration plan, defendant also cites to other concerns. Because defendant

---

**56.** *See id.,* tab 6, at 17; *see also id.,* tab 7, at 3 (noting that defendant's concerns regarding plaintiff's proposed work force factored into its conclusions regarding plaintiff's transition integration plan).

**57.** Pl.'s Mot. at 10.

**58.** Plaintiff's Proposed Findings of Uncontroverted Facts (Amended) (PFOF) ¶ 25.

**59.** A.R., tab 9, at 6.

**60.** *Id.*

**61.** *Id.* (emphasis added).

**62.** PFOF ¶ 25.

**63.** A.R., tab 9, at 6; *see also id.,* tab 7, at 3.

**64.** Tr. at 72–73.

**65.** A.R., tab 11, ¶ 5.2.4, at 17.

appears to have relied upon these factors, as well as those previously discussed, in reaching its determination as to this portion of plaintiff's proposal, this court briefly considers them here.

As one example, another basis for defendant's decision regarding plaintiff's transition integration plan is the evaluators' assertion that they were unable to verify that plaintiff had proposed the appropriate level of personnel for the tasks proposed.[66] The evaluators noted that this inability was due to the fact that plaintiff's proposal did not provide planned labor hours for the tasks it was to perform.[67] Plaintiff contends that the solicitation contains no such requirement.[68] The solicitation, however, expressly states that "[p]lanned labor hours and material costs shall be presented corresponding to the individual tasks."[69] This requirement supports the reasonableness of defendant's position.

Finally, plaintiff's proposal indicates that plaintiff planned to shift aircraft inductions slightly, but that this shift would not negatively impact the required delivery schedule.[70] Defendant's evaluators, however, determined that plaintiff planned to delay aircraft inductions by an average of one month and showed that plaintiff planned to deliver one aircraft nine days late.[71] The solicitation explicitly requires that an offeror's transition integration plan "not interrupt aircraft inductions and deliveries per the [Best Estimated Quantity] Aircraft Input/Delivery Schedules provided in the [solicitation]."[72] The failure of plaintiff's proposal to satisfy this express solicitation requirement incontestably provides a reasonable basis for defendant's negative assessment of this portion of plaintiff's proposal. Plaintiff provides no evidence, much less clear and convincing evidence, to the contrary.

### 2. Production Operations

As part of the solicitation, defendant provided a technical requirements document identifying all of the tasks that might be required in the performance of programmed depot maintenance on a C–5 aircraft. The technical requirements document describes the tasks to be performed and the technical orders to be complied with in the performance of these tasks. The technical requirements document was provided to the offerors, and copies of the technical orders were included in the offerors' library, in order to assist the offerors in developing their contractor work specifications, which define all of the tasks an offeror agrees to perform under the contract.[73]

In order to satisfy the evaluation criteria for the production operations factor, offerors were to provide a contractor work specification that met the performance standards of the technical requirements document. Offerors also were to describe their plans to perform additional government and commercial work at the facility during the course of contract performance, indicate commitments to provide the additional work, and identify the benefits of this additional work for the operation of the C–5 Business Area. "The [contractor work specification] shall be written in compliance language since it will be incorporated into the contract."[74]

In addition, offerors were to provide a work activity flow plan for the complete maintenance effort on both C–5A and C–5B aircraft. Building upon the tasks listed in the contractor work specification, the work activity flow plan should describe the sequence in which the tasks shall be performed.[75] The work activity flow plan also should indicate the time that will be required to perform each task set out in the contractor work specification.

66. *Id.*, tab 9, at 3; *Id.*, tab 8, at 1.

67. *Id.*, tab 9, at 3.

68. Amended Complaint (Compl.) ¶ 22.

69. A.R., tab 14, cl. L–900, ¶ 5.1(c), at 23.

70. *Id.*, tab 12, vol. IIA; at IIA–1–15.

71. *Id.*, tab 9, at 7.

72. *Id.*, tab 14, cl. M–900, ¶ 6.0, at 28.

73. *Id.*, tab 14, cl. L–900, ¶ 4.2, at 22.

74. *Id.*

75. *Id.*, tab 14, cl. L–900, ¶ 4.1.2, at 21.

Next, the offerors were to assemble a realistic time-phased integration plan that merged all of the work activity flow plan for all aircraft to be serviced in the offeror's busiest year. The work activity flow plan and transition integration plan are then combined to create a continuing operations plan, which is to be the guide for the offeror's performance from the end of the transition period until contract completion.

According to defendant, the "source of the greatest proposal risk for [plaintiff's] proposal was the poor quality of its [contractor work specification] and other program planning documents." [76] In that regard, defendant the contractor work specification provided in plaintiff's proposal to be unenforceable as written and unacceptable without major revision. [77] The SSA based this determination upon the findings that plaintiff's contractor work specification "demonstrates a severe lack of understanding of the [t]echnical [r]equirements [d]ocument, the [w]ork [a]ctivity [f]low [p]lan does not accurately reflect the [contractor work specification] tasks and the task durations are poorly defined." [78] In addition, the SSA stated that "the poor quality of the contractual statements in [plaintiff's contractor work specification] effectively hinders [defendant's] ability to enforce requirements contained in approved technical orders and related engineering instruction, thereby limiting [defendant's] ability to mitigate risk." [79] Based upon these considerations, defendant determined that plaintiff's production operations plan would have to be completely rewritten before being acceptable. Consequently, defendant assigned this portion of plaintiff's proposal a "Red–High" rating. [80]

Plaintiff contests defendant's conclusion that plaintiff's contractor work statement is inadequate. In addition, plaintiff asserts that its work activity flow plan is sufficiently detailed and references all corresponding major contractor work specification work activities, which also are cross-referenced to technical requirements document sections in other documents. Thus, plaintiff maintains that the submitted documents show that it clearly understands the technical requirements document.

Plaintiff further contends the finding in the SSA's determination that "the task durations are poorly defined," [81] misstates the requirements of the solicitation. Specifically, plaintiff asserts that, while the solicitation requires the flow plan to include logical work sequences and work durations, the contractor work specification requirements do not mandate that task durations be provided. Plaintiff therefore maintains that defendant incorrectly read such a requirement into the solicitation and that defendant's error shows that its determinations lack a reasonable basis.

### a. Contractor Work Specification

As noted, plaintiff disputes defendant's determination that plaintiff's contractor work specification was unacceptable and required major revision. In that regard, plaintiff argues that its contractor work specification is written in compliance language and "defines work elements to a level of detail [that], in most cases, exceeds the detail in the [technical requirements document]." [82] Defendant does not contest that many parts of plaintiff's contractor work specification contain extensive detail. Defendant argues, however, that this acknowledgment does not

---

**76.** Defendant's Response to Plaintiff's Motion for Summary Judgment at 5 (citing A.R., tab 4, at 45–46).

**77.** A.R., tab 3, at 1.

**78.** *Id.*

**79.** *Id.*

**80.** Further, defendant determined that plaintiff's proposal failed to satisfy two of the three standards for evaluation regarding the provision of additional work at the C–5 Business Area. Although plaintiff does not contest this conclusion, defendant notes that its findings in this area contributed to the overall decision to assign a "Red–High" rating to the production operations portion of plaintiff's proposal. Defendant's Motion for Summary Judgment (Def.'s Mot.) at 50–52.

**81.** A.R., tab 3, at 1.

**82.** Compl. ¶ 28.

eliminate the fact that plaintiff's contractor work specification also omits critical details for the performance of other tasks.[83] Defendant also notes that plaintiff's cross-reference matrix, which cross-references each section of the technical requirements document and contractor work specification, contains errors that are misleading when trying to locate the appropriate sections of the contractor work specification.[84] Finding that plaintiff failed to provide a contractor work specification that accurately captured all of the elements of the technical requirements document, defendant concluded that plaintiff lacked an understanding of what was required under the solicitation and failed to meet the evaluation standards for this factor.

Plaintiff asserts that defendant's determinations regarding the alleged deficiencies in the language used in plaintiff's contractor work specification are based upon four specific DRs.[85] First, plaintiff takes issue with the deficiency examples cited in DR 73 in support of defendant's finding that plaintiff's contractor work specification is not written in compliance language. Plaintiff asserts that these examples "are at most confusions which could be cleared up in discussions, not serious defects."[86] Decisions regarding the severity of a "confusion" are, however, well within the discretion of defendant's contracting officials who have special expertise in making such determinations. Thus, where a plaintiff is merely disagreeing with defendant's categorization of the magnitude of a "confusion," this court will not substitute its judgment for that of defendant's contracting officials.[87]

Plaintiff also challenges defendant's statements in DR 66 that plaintiff's contractor work specification fails to meet the performance standards for each task in the technical requirements document and either omits or incorrectly cites technical orders. In its briefings to this court, however, defendant refers to several instances where plaintiff's contractor work specification fails to adequately address all of the tasks or satisfy the performance standards in the technical requirements document. More specifically, defendant notes the evaluators' finding that plaintiff's contractor work specification fails to state that plaintiff will comply with the required paragraphs of a technical order governing certain critical inspections.[88]

Regarding the alleged failure to reference appropriate technical orders, plaintiff maintains that its contractor work specification complies with all of the technical orders required to be followed. Specifically, plaintiff asserts that this standard is met because Section 2 of its contractor work specification lists all of the technical orders as being applicable to the work and indicates that specific technical order references are made in the contractor work specification only when necessary to define a specific requirement.[89] Despite this statement regarding the general applicability of the technical orders, however, without citing the proper technical orders within the specific tasks in the contractor work specification, plaintiff is not bound to perform the tasks in accordance with the technical order.[90] Moreover, without such specific references, defendant could not be certain that plaintiff would follow, or could even accurately identify, the appropriate technical orders in performing the required operations. It therefore was reasonable for

**83.** A.R., tab 9, at 17–18.

**84.** *Id.*, tab 7, at 7–8.

**85.** PFOF ¶ 39.

**86.** *Id.* ¶ 41.

**87.** This court reaches the same conclusion regarding plaintiff's arguments as to the alleged work activity flow plan discrepancies set out in CRs 77, 82, 83, and 93. *See* PFOF ¶ 47. This court further notes that these stated discrepancies, the soundness of which plaintiff does not challenge, may further contribute to the reasonableness of the overall "Red–High" rating for the production operations portion of plaintiff's proposal.

**88.** Def.'s Mot. at 43–44 (citing A.R., tab 9, at 17). Other instances of failures to reference appropriate technical orders also are cited by defendant in order to demonstrate the reasonableness of its conclusions regarding this portion of plaintiff's proposal. *See id.*

**89.** PFOF ¶ 43 (citing Pl.Ex. 1c, ¶¶ 3.1.1 and 2.2; tbl. 2–2).

**90.** *See* A.R., tab 9, at 17.

defendant to conclude that the use of general technical order references not only is non-compliant with the technical requirements document, but also poses a risk to performance.

Further, plaintiff contests defendant's finding that plaintiff's proposal does not properly define the task durations such that defendant's evaluators would be able to verify the proposed resequencing and duration reductions. In its proposal, plaintiff contemplates reducing the time required to perform C–5 maintenance tasks by an average of 20%.[91] Plaintiff's proposal states that plaintiff could achieve these reductions in 65% of the two thousand required program depot maintenance tasks, but provided examples of only three tasks that it had re-engineered, along with "typical rationale for the modified estimates."[92] In the action before this court, plaintiff claims that the page limitations of the proposal did not allow for presentation of justification of each of the approximately 65% of the operations that were to be modified. The existence of these page limitations, however, does not decrease the legitimacy of defendant's concerns that its evaluators could not verify the validity of plaintiff's proposed reductions without additional information.[93] In light of the potential negative impact that this inability to verify could have upon contract performance, defendant's evaluators, within their discretion, reasonably marked down this portion of plaintiff's proposal.

Similarly, defendant's evaluators determined that, because plaintiff failed, anywhere in its proposal, to provide hours for the tasks identified in the contractor work specification, they could not assess whether the task durations proposed in plaintiff's work activity flow plan were adequate.[94] Defendant argues that plaintiff misstates the requirements of the solicitation in asserting that the solicitation does not require that labor hours, necessary to complete major contractor work specification tasks, be provided. According to defendant, the solicitation clearly requires offerors to provide this information in their cost/price proposals.[95]

Plaintiff does not contest the veracity of defendant's statement that the solicitation requires such information to be provided in an offeror's cost/price proposal. Rather, plaintiff responds to defendant by insisting that the solicitation requires that an offeror's work activity flow plan include "logical work sequences and work durations,"[96] but does not require the presentation of task durations in days or hours. Plaintiff further asserts that its work activity flow plan was presented on time-scaled charts that adequately reflect the duration of each task.[97]

Additionally, plaintiff states that, as part of its proposal, it submitted a computer disk that included durations for each task bar on the charts in terms of days and hours. Plaintiff thus maintains that defendant's concerns are "only a question of the format in which the charts are printed."[98] This argument is, however, unclear in light of the fact that the solicitation states that "[f]ive hard copies and two electronic copies [of an offeror's proposal] should ... be provided."[99] The clear implication of this requirement is that the hard copies and electronic copies should be the same. Given this instruction, this court is unpersuaded that any concerns raised by defendant were merely a question of format.

Plaintiff also asserts that defendant's evaluators were able to access the specific task

---

91. *Id.*, tab 12, at IIA–2–11.

92. *Id.*, tab 12, at IIA–2–12; *see also id.*, tab 12, at IIA–2–11.

93. *Id.*, tab 8, at 9; *see also id.*, tab 7, at 11; *id.*, tab 9, at 21.

94. *Id.*, tab 9, at 19.

95. *Id.*, tab 14, cl. L–900, ¶ 4.1.2, at 21 (requiring that durations for major tasks be provided in the contractor work specification), and ¶ 5.1(c), at 23 (stating that planned labor hours shall be presented in the cost/price proposal corresponding to each task defined in the contractor work specification).

96. *See id.*, tab 14, cl. M–900, ¶ 6.0(a)(2), at 28.

97. *Id.*, tab 12, vol. IIC, figs. 2–2 and 2–3, at IIC–2–6 to –22.

98. PFOF ¶ 53.

99. A.R., tab 14, cl. L–900, ¶ 2.0, at 18–19.

durations from plaintiff's computer disk, as evidenced by the fact that the evaluators reference task durations in their technical evaluation worksheets. While it is true that the specific evaluation worksheets cited by plaintiff demonstrate that defendant's evaluators make reference to particular task durations, such a showing is far from the clear and convincing evidence required to persuade this court that defendant's conclusions in this area lack a reasonable basis. In fact, the pages cited by plaintiff actually lend further support to the reasonableness of defendant's findings. In that respect, one evaluator notes that the durations proposed in plaintiff's charts are inconsistent with delivery commitments set out elsewhere in plaintiff's proposal.[100] The evaluator further says that, due to these discrepancies, plaintiff's commitment to accomplish certain activities within a stated time period "does not appear to be logical." [101] Plaintiff does not clearly and convincingly refute the reasonableness of these findings.

Nor does plaintiff provide this court with clear and convincing evidence that its proposal contained sufficient information to permit defendant's evaluators to assess whether the proposed task durations were adequate. Absent such a showing, this court will not interfere with the broad discretion afforded contracting officials in the evaluation process.

### b. *Continuing Operations Plan*

■■■ Defendant also determined that plaintiff's proposal fails to meet the solicitation requirement to provide a realistic time-phased continuing operations plan based upon a complete and accurate work activity flow plan and a time-phased integration plan.[102] In their evaluation of plaintiff's work activity flow plan, defendant's evaluators concluded that plaintiff failed to meet several of the subparts of the evaluation standard for this portion of the proposal.

First, defendant found that plaintiff's work activity flow plan was inconsistent with the contractor work specification or technical requirements document, as required by the solicitation. While defendant acknowledges that plaintiff listed tasks identified in its contractor work specification, defendant maintains that plaintiff's work activity flow plan is incomplete and inaccurate, and cites specific examples where tasks identified in plaintiff's contractor work specification are not included in plaintiff's work activity flow plan.[103] Because the work activity flow plan must integrate all of the tasks defined in the contractor work specification in proper sequence,[104] in order to insure that the contractor work specification tasks are properly integrated and identified in the correct sequence, defendant argues that correction of plaintiff's omissions would require a complete rewriting of plaintiff's work activity flow plan.

To challenge defendant's finding that its work activity flow plan does not accurately reflect the contractor work specification tasks, plaintiff asserts that all of the tasks referenced in its work activity flow plan "relate directly back to the specific numbered sections in the [contractor work specification]." [105] In addition, plaintiff asserts that each major task in the work activity flow plan and contractor work specification relates back to specific technical requirements document tasks and is referenced in the contractor work specification matrices.[106] Beyond simply citing the court to broad portions of its proposal, which were reviewed by defendant's evaluators, plaintiff provides no evidence to support its assertions. Moreover, plaintiff seems to admit that certain discrepancies existed concerning its work activity flow plan.[107] Plaintiff contends, however, that these discrepancies are not actually defects but instead are matters that could be

---

100. *Id.*, tab 9, at 20.

101. *Id.* at 21.

102. *Id.*, tab 14, cl. M–900, ¶ 6.0(a)(2), at 28.

103. Def.'s Mot. at 47.

104. *See* A.R., tab 14, cl. M–900, ¶ 6.0(a)(2), at 28.

105. PFOF ¶ 51.

106. *Id.*

107. *Id.* ¶ 47.

addressed through discussions.[108] On such questions, this court will not substitute its judgment for that of defendant. Decisions concerning whether or not a discrepancy is readily correctable through discussions are clearly within the discretion of defendant's contracting officials.

Plaintiff also challenges defendant's determination that the task durations in its work activity flow plan are poorly defined. In its proposal, plaintiff suggests sequence changes and time savings regarding program depot maintenance. Defendant's evaluators determined that additional information on the task durations was needed in order to verify the feasibility of plaintiff's planned changes and savings. In that regard, the solicitation specifically directs offerors: "If your work activity flow plan is different than the current flow plan ... provide sufficient task detail to demonstrate proposed advantages over the current task sequence, task duration and/or corresponding facility usage."[109] The question of sufficiency of detail is a matter that is best left to the discretion of defendant's contracting officials.[110]

In addition to the above-mentioned deficiencies found in plaintiff's proposed work activity flow plan, defendant also identified errors and inconsistencies in plaintiff's time-phased integration plan. For example, defendant determined that plaintiff's proposal contains a serious discrepancy as to the number of personnel available for the final year of the contract.[111] Plaintiff does not contest this finding. Likewise, plaintiff has not clearly and convincingly discredited the reasonableness of defendant's finding that plaintiff's proposal fails to address its equipment requirements in its busiest year.[112] Although plaintiff quotes from its proposal that its "scheduling process has effectively removed

any potential [equipment] problems,"[113] the solicitation expressly requires that equipment support be identified.[114] The language in its proposal upon which plaintiff relies clearly does not identify the necessary equipment. In sum, the forementioned discrepancy and omission reasonably led the evaluators to mark down this portion of plaintiff's proposal.

### c. Over–and–Above Work

In DRs 249 and 251, defendant's evaluators state that plaintiff's proposal fails to address its plans to differentiate between over-and-above work and fixed-price work. Plaintiff contends, however, that the required distinction is described in its proposal. In support of its position, plaintiff cites to the portion of its proposal that addresses over-and-above work. In that section, plaintiff proposes to follow commercial practices as the basis for its over-and-above approach and indicates that other portions of its proposal "distinguish methodically between the 'basic [program depot maintenance]' work and [over-and-above work]. These different types of work are defined and tracked as completely different work categories."[115]

The language in the cited section, however, does not constitute clear and convincing support for plaintiff's contention that defendant erred in concluding that plaintiff's proposal fails to describe plaintiff's plan for differentiating between the two categories of work. In fact, beyond these general statements, plaintiff has not provided any evidence to show that its proposal adequately distinguishes between over-and-above and work specification tasks. Nor does plaintiff refute the reasonableness of defendant's conclusions that plaintiff's proposal fails to "provide the source(s) in which the 'work spec' tasks are

---

108. *Id.*; Pl.'s Resp. at 12.

109. A.R., tab 14, cl. L–900, ¶ 4.1.2, at 21.

110. This court's conclusions concerning the reasonableness of defendant's findings regarding the adequacy of the task durations provided in plaintiff's proposal are more thoroughly set out in the preceding section.

111. *Id.*, tab 8, at 12; *Id.*, tab 9, at 25.

112. *Id.*, tab 6, at 16.

113. *Id.*, tab 12, vol. IIA, ¶ 2.1.8, at IIA–2–17.

114. *Id.*, tab 14, cl. L–900, ¶ 4.1.2, at 21 (requiring a description of "the resources required to adequately support each major event, as they apply to ... equipment"); *Id.*, tab 14, cl. M–900, ¶ 6.0(a)(2), at 28 (demanding inclusion of equipment requirements).

115. *Id.*, tab 12, ¶ 2.1.6, at IIA–2–14.

defined [or] explain[s plaintiff's] rationale for determining whether a task is 'work spec' or [over-and-above]."[116] This court therefore concludes that plaintiff has failed to meet its burden to show, by clear and convincing evidence, that defendant lacked a reasonable basis for its findings as to the adequacy of the over-and-above portion of plaintiff's proposal.

### d. Nose–To–Tail Scheduling

■ Further, plaintiff challenges defendant's conclusion that plaintiff's proposal does not adequately address the risks of its proposed "Nose–To–Tail" scheduling approach. Because of a perceived potential for delays when using this approach, the evaluation team determined that plaintiff should have discussed its proposed "Nose–To–Tail" scheduling approach as a risk. For its part, plaintiff acknowledges that its proposal does not expressly identify its "Nose–To–Tail" approach as a potential risk area. Plaintiff notes, however, that several sections of its proposal fully identify and address risks associated with nose-to-tail scheduling and explain plaintiff's mitigation plans.[117] Plaintiff therefore contends that the SSA's determination that plaintiff's proposal fails to address the risks of nose-to-tail scheduling has no reasonable basis in the record.

Contrary to plaintiff's assertions and despite its citations to its proposal, this court concludes that a reasonable basis exists for defendant's determination. As defendant points out, its evaluators considered the discussion of production operations risks in table 2–7 of plaintiff's proposal, but concluded that plaintiff should have explicitly discussed its plan to mitigate the potential risks associated with nose-to-tail scheduling.[118] In fact, in table 2–7, although plaintiff discusses nose-to-tail scheduling as part of its risk mitigation plan, it fails to identify nose-to-tail scheduling as a potential risk area.[119] Thus, this court must reject plaintiff's reliance upon

this table as supporting its contention that its proposal adequately identifies the risks associated with this approach. Likewise, although plaintiff asserts that other parts of its proposal address areas *"whose risks include those problems* associated with nose-to-tail scheduling,"[120] such a broad discussion of risks does not provide clear and convincing evidence that no reasonable basis exists for defendant's findings regarding plaintiff's failure to adequately address the potential risks associated with its proposed nose-to-tail scheduling approach.

In the context of nose-to-tail scheduling, plaintiff also claims that, "[t]o the extent the SSA's determination is based upon a finding the nose-to-tail scheduling is an inherently high risk approach which is not appropriate for C–5 [program depot maintenance], then a finding would be a conflict with the [solicitation's] stated requirements and standards and is inherently unreasonable."[121] Specifically, plaintiff contends that such a finding would conflict with the solicitation's Statement of Objectives, which directs offerors to utilize processes that are consistent with Air Force or commercial methods, and also will increase efficiencies and reduce costs.[122]

In presenting this argument, however, plaintiff seems to be reading innuendo into defendant's findings. Indeed, the alleged conflict asserted by plaintiff is somewhat unclear to this court. This lack of clarity is heightened by the fact that plaintiff fails to cite this court to any place in the record to support its contention that defendant found nose-to-tail scheduling to be an "inherently high risk approach which is not appropriate for C–5 [program depot maintenance]."[123] Rather, this court's review of the record reveals that defendant's evaluators were concerned about the "inflexibility of nose-to-tail [scheduling] during steady-state production [and viewed t]he potential for cascading de-

116. *Id.*, tab 7, at 18.

117. *See* PFOF ¶ 37 (citing Pl.'s Ex. 1a, tbl. 3.1; Pl.'s Ex. 1b, ¶¶ 2.19, 2.2, tbls. 2–6, 2–7).

118. A.R., tab 7, at 19.

119. *Id.*

120. PFOF ¶ 37.

121. Pl.'s Mot. at 12.

122. A.R., tab 14, attachment 1, at 69.

123. Pl.'s Mot. at 12.

lays caused by one late aircraft ... as a significant risk area." [124] Defendant also determined that "nose-to tail scheduling[ ] is a high risk approach to [program depot maintenance]." [125]

Simply because defendant determined that nose-to-tail scheduling posed significant/high risks to performance does not mean that defendant found the approach to be inappropriate for the project. To the contrary, all that defendant's conclusions suggest is that this approach posed risks to the project, which needed to be expressly addressed in plaintiff's proposal. Indeed, the solicitation encourages offerors to propose alternative approaches to the sequence of tasks to be performed within production operations.[126] The solicitation, however, also specifically requires offerors to identify and fully discuss the potential risks of such alternatives.[127] Thus, defendant did not act unreasonably in requiring such identification and explanation.

### 3. *Corporate Operations*

In reviewing plaintiff's proposal regarding its corporate experience, defendant's evaluators determined that plaintiff failed to show that it had five years of experience maintaining or manufacturing heavy aircraft with a workload similar to that of the C–5 Business Area. The evaluators further concluded that plaintiff's experience with heavy aircraft was not sufficiently similar to the work to be done in the ˙C–5˙ Business Area and that the contracts described by plaintiff were not sufficiently similar to the C–5 Business Area in terms of overall responsibility and work intensity. The evaluators also concluded that, while plaintiff's proposed corporate structure was sufficient to meet the business management needs of the C–5 Business Area, its proposed schedule for implementation of the management information system was overly aggressive and warranted a high risk rating. These findings were identified as weaknesses

in plaintiff's proposal and were briefed to the SSA.

#### a. *Heavy v. Large Aircraft*

█ With regard to defendant's conclusions as to the corporate operations portion of plaintiff's proposal, plaintiff contends that . defendant misstates the requirements of the solicitation. Specifically, plaintiff argues that defendant improperly read a heavy aircraft requirement, which is contained in the transition portion of the solicitation, into the corporate operations portion of the solicitation. Plaintiff maintains that no such requirement exists. To the contrary, the corporate operations portion of the solicitation requires a "minimum of 5 years of corporate management experience within the last 10 years in ... aircraft inspection and repair, major modification, or manufacture of 300,000 lbs maximum take-off gross weight aircraft." [128] Heavy aircraft, as defined in the transition portion of the solicitation, are aircraft with a take-off gross weight greater than 300,000 lbs. Thus, plaintiff asserts that defendant clearly erred in imposing a heavy aircraft requirement upon the corporate operations portion of the solicitation.

The solicitation, however, seeks experience managing maintenance or manufacturing programs similar in responsibility to the C–5 Business Area. Clearly, the C–5 is a heavy aircraft, as defined in the solicitation. This factor alone implies that the corporate experience sought would require work with heavy aircraft. In addition, although the corporate experience section of the solicitation refers to aircraft with a maximum weight of 300,000 pounds, the offerors were informed in a pre-solicitation conference that the corporate operations factor would require experience with heavy aircraft.[129] Because defendant stated at the pre-solicitation conference, which plaintiff's representative[s] attended,[130] that the corporate experience requirement in-

---

124. A.R., tab 7, at 19–20.

125. *Id.*, tab 4, at 44.

126. *Id.*, tab 14, cl. L–900, ¶ 4.1.2, at 21.

127. *Id.*

128. *Id.*, tab 14, cl. M–900, ¶ 6.0(a)(3), at 29.

129. *Id.*, tab 19, at 23.

130. During oral argument, plaintiff's counsel indicated that plaintiff's representative[s] attended at least some of pre-solicitation meetings. Tr. at 29.

volved heavy aircraft work, plaintiff cannot now contend that it did not understand that such experience would be required. Even if, as plaintiff contends *without citation*, representations made by defendant at these conferences are not binding, by virtue of the fact that these particular representations were made, plaintiff at least should have been on notice that the corporate experience requirement included work with heavy aircraft. *Cf. Sharpe Refrigeration, Inc. v. United States*, 30 Fed. Cl. 735, 738 (1994) (indicating that official statements made during pre-bid conferences to clarify contract language should be utilized in resolving questions of contract interpretation).

At the very least, the fact that the solicitation clearly involves work with heavy aircraft and refers to heavy aircraft experience in the transition section should have led plaintiff to question why large aircraft, rather than heavy aircraft, experience was referenced in the corporate operations section of the solicitation. Moreover, the fact that the corporate experience portion of plaintiff's proposal emphasizes its heavy aircraft, as opposed to large aircraft, experience indicates to this court that, prior to this litigation, plaintiff recognized that heavy aircraft experience would be required.

*Arguendo*, assuming the reasonableness of plaintiff's interpretation to the extent that it is not inconsistent with the rest of the contract, this court determines that a patent ambiguity exists such that a duty of inquiry was placed upon plaintiff. *Fortec Constructors v. United States*, 760 F.2d 1288, 1291 (Fed.Cir.1985). A reasonable contractor in plaintiff's position, *i.e.*, a contractor bidding on a contract for heavy aircraft maintenance, should have questioned why the only corporate experience called for in the solicitation was for large aircraft. *Community Heating & Plumbing Co. v. Kelso*, 987 F.2d 1575, 1579 (Fed.Cir.1993); *see also Lockheed Martin IR*

*Imaging Sys., Inc. v. West*, 108 F.3d 319, 322 (Fed.Cir.1997).

### b. *Corporate Personnel*

■ Alternatively, plaintiff asserts that, even if the solicitation requires "heavy aircraft" experience, plaintiff's proposal should not have been marked down because plaintiff possesses the requisite experience. More particularly, plaintiff contends that defendant improperly failed to credit plaintiff for the experience of its president and vice-president. According to defendant, however, the relevant portion of the solicitation seeks "corporate management experience," not the experience of individuals within the corporate structure.[131] Plaintiff insists that personal experience of management employees should qualify for a corporate experience requirement such as the one at issue here.[132]

Defendant maintains that the experience of these two individuals properly was not counted toward plaintiff's corporate experience and notes that plaintiff did receive credit for their experience under the transition factor. Significantly, the experience called for under the transition factor was "workforce experience."[133] By contrast, the corporate operations factor asked for "corporate management experience."[134] Given these differences, it was reasonable for defendant's contracting officials to conclude that the experience of plaintiff's president and vice-president should be counted in one area but not the other.

### c. *Adequacy*

■ Finally, plaintiff contends that the only support for the SSA's determination regarding this portion of plaintiff's proposal is found in DR 57, and admonishes defendant for attempting to rely upon "superfluous" cites to the record as further support for the decision.[135] These so-called "superfluous" cites, however, are a part of the record that was before the SSA when she rendered her

---

131. A.R., tab 14, cl. M–900, ¶ 6.0(a)(3), at 29. In addition, plaintiff's proposal received credit for the experience of these individuals in the transition factor. *See* Def.'s Mot. at 38 n. 13.

132. Although plaintiff cites Comptroller General decisions in support of this, such decisions are not binding on this court. *See Advanced Distrib.*

*Sys., Inc. v. United States*, 34 Fed. Cl. 598, 604 n. 7 (1995); *CACI*, 13 Cl.Ct. at 731 n. 28.

133. A.R., tab 14, cl. M–900, ¶ 6.0(a)(*l*), at 28.

134. *Id.*, tab 14, cl. M–900, ¶ 6.0(a)(3), at 29.

135. Pl.'s Resp. at 13.

decision. Consequently, as this court already has stated, these additional references, which primarily consist of evaluator's comments and findings, properly may be cited in support of defendant's conclusions. Additionally, beyond asserting that defendant should not rely upon these documents here, plaintiff says nothing to refute the reasonableness of the substance of these findings.[136]

Moreover, this court will not disturb defendant's conclusion that plaintiff lacked the requisite heavy aircraft experience. This court is satisfied that such a decision wa. squarely within the discretion of defendant's contracting officials who possess special expertise with regard to such procurements. Specifically, such contracting officials are in the best position to decide whether the "magnitude" of an offeror's prior experience is the same as the work required for a given procurement, or whether the type of work is even comparable. In the absence of a clear and convincing showing by plaintiff that such decisions were not reasonably-based, this court will not substitute its judgment for that of defendant's contracting officials.

### 4. *Logistics Support*

■ The SSA's determination concludes that plaintiff's proposed approach to logistics support is inadequate due in large part to plaintiff's failure to provide sufficient details on its plan. Defendant therefore assigned plaintiff's proposal a "Yellow–Moderate" rating for this factor. In support of this rating, defendant's evaluators concluded that plaintiff's proposal failed to provide the details on manpower and facilities necessary to determine whether plaintiff could provide the logistics support within the required task durations.[137] Defendant's evaluators determined that these details were important in assessing the risk of a proposed approach because a lack of sufficient manpower and facilities would directly impact the contract performance schedule.[138] The evaluators also determined that plaintiff's proposal failed to provide sufficient detail regarding its proposed risk mitigation efforts in order to en-

able them to determine the adequacy of plaintiff's plans.[139]

In challenging defendant's determination that the logistics portion of its proposal is not sufficiently detailed, plaintiff argues that its proposal fully addresses all aspects of its logistics plan. Stated differently, plaintiff generally challenges defendant's conclusions regarding the adequacy of the information provided in its proposal. Decisions as to the adequacy of the information presented in a proposal are, however, rightfully left to the discretion of evaluators, especially where, as here, the decisions are technical in nature.

When defendant's contracting officials conclude that a plaintiff's proposal is inadequate and the plaintiff raises no allegations of impropriety, this court must defer to the expertise of the contracting officials. Indeed, beyond citing to the same portions of its proposal that defendant's evaluators found to be inadequate, plaintiff provides no support for its position. Thus, plaintiff has failed to present to this court clear and convincing evidence that defendant's conclusions regarding the logistics support portion of plaintiff's proposal lack a reasonable basis.

### 5. *Source of Repair Qualifications*

Plaintiff's proposal was assigned a "Yellow–High" rating for the source of repair qualifications area of its proposal. In that regard, defendant determined that plaintiff's proposal fails to clearly identify the safety-of-flight processes for the program depot maintenance of a C–5 and did not provide historical data to support its repair station ratings. Plaintiff disputes these findings and asserts that its proposal provides the necessary identification and data.

#### a. *Safety–of–Flight and Other Critical Processes*

■ In order to meet this evaluation factor, an offeror's proposal was to include a comprehensive quality program identifying "critical processes for [m]easuring and analyzing successful completion of critical *and*

---

**136.** A.R., tab 9, at 33–34.

**137.** *Id.* at 48–49.

**138.** *Id.*

**139.** *Id.* at 53–54.

safety-of-flight processes." [140] Generally, defendant asserts that plaintiff's proposal fails to clearly differentiate between safety-of-flight and other, *i.e.*, non-safety-of-flight, critical processes.[141] More specifically, defendant determined that, although plaintiff's proposal contains a discussion of the safety-of-flight critical processes, it fails to identify non-safety-of-flight critical processes that it would monitor.[142] As the above quotation shows, the solicitation expressly requires that a proposal identify both critical *and* safety-of-flight processes. Plaintiff's proposal, however, addresses only safety-of-flight critical processes.[143] As such, the proposal appears to ignore the inclusion of the word "and" in the solicitation. A reasonable basis therefore exists for defendant's determination that plaintiff's proposal failed to meet the standard for critical processes.

### b. *Historical Data*

■ With regard to satisfaction of this standard, the solicitation directs that a proposal is to use historical data from similar workload(s) in order to validate the proposed methods for appropriateness.[144] Defendant determined that plaintiff's proposal failed to provide such data, thereby making it impossible for defendant to substantiate plaintiff's "methods of measuring and analyzing [safety-of-flight] and critical processes."[145] In challenging defendant's determination, plaintiff argues that its proposal provides the required historical data and notes that its proposal contains a copy of its official Federal Aviation Administration repair station certificate (FAA certificate).[146] According to plaintiff, this certificate contains historical information on its face. In addition, plaintiff asserts that the solicitation does not require presentation of supporting historical data for repair station ratings.

Defendant allows that the FAA certificate is sufficient to satisfy the requirement that an offeror demonstrate "previously achieved institutional proficiency in the inspection and repair, major modification, or manufacture of heavy aircraft." [147] Defendant maintains, however, that offerors also were required to submit historical data from other repair station ratings to demonstrate previous experience monitoring safety-of-flight and other critical processes. As support for the existence of this requirement, defendant cites two sections of the solicitation that address the source of repair qualification factor. First, Clause L–900, ¶ 4.1.5 instructs that offerors are to "[p]resent relevant, historical information from programs of similar technical scope as validation of the proposed [performance] assessment methods." [148] Similarly, clause M–900, ¶ 6.0(a)(5) directs offerors to "identif[y] critical processes for … validating proposed methods for appropriateness using historical data from similar workload." [149] These provisions are separate and distinct from the above-quoted statement regarding the FAA certificate.

Based upon the plain language of the solicitation, this court rejects plaintiff's argument that the FAA certificate satisfies the historical data requirement, as well as its contention that defendant misstated the requirements of the solicitation. This court concludes that a reasonable basis exists for defendant's determination that plaintiff failed to furnish the requisite historical data, which hampered defendant's ability to evaluate plaintiff's proposal. Because this court determines that defendant's conclusions as to the source of repair qualifications section of plaintiff's proposal are reasonable, it necessarily decides that the rating assigned to this

---

140. A.R., tab 14, cl. M–900, ¶ 6.0(a)(5), at 29 (emphasis added).

141. Def.'s Mot. at 61.

142. A.R., tab 4, at 56–57; *see also id.*, tab 9, at 59 (stating in evaluator's notes that not all critical processes are safety-of-flight).

143. *Id.*, tab 12, vol. IIA, ¶ 5.14, at IIA–5–12.

144. *Id.*

145. *Id.*, tab 9, at 59; *see also id.*, tab 3, at 2.

146. *Id.*, tab 12, at IIA–5–3.

147. *Id.*, tab 14, cl. M–900, ¶ 6.0(a)(5), at 29; *see also id.*, tab 9, at 56.

148. *Id.*, tab 14, cl. L–900, ¶ 4.1.5, at 22.

149. *Id.*, tab 14, cl. M–900, ¶ 6.0(a)(5), at 29.

portion of plaintiff's complaint is reasonable as well.

### 6. Cost

As further support for the propriety of its decision to exclude plaintiff's proposal from the competitive range, defendant cites to its determination that plaintiff's cost proposal, including its underlying labor rates, is unrealistic and incomplete.[150] Defendant's evaluators determined that plaintiff's proposal is unrealistic because it proposes a composite labor rate significantly lower than the market rate for San Antonio and asserts that this labor rate could be subsidized by income from additional unspecified commercial work. Similarly, the evaluators concluded that plaintiff's proposal is incomplete in that it fails to provide information to substantiate its proposed labor rates, facilities lease costs, and facilities maintenance costs. The evaluation team also found price discrepancies in various parts of plaintiff's proposal. With regard to these alleged deficiencies, plaintiff contends that defendant either misread plaintiff's proposal, or has utilized a flawed wage rate evaluation and taken an unreasonable position concerning lease costs.

#### a. Labor Rate

■ With regard to plaintiff's proposed labor rate, the cost evaluation team determined that plaintiff's proposed rate is significantly less than defendant's projected wage rate for the same workers in the same region. Notably, while plaintiff proposes a direct labor wage rate of $12.11 for FY98, the cost evaluation team set the government wage rate for the same work, area, and year at $13.81. In addition to finding plaintiff's proposed rate to be unrealistic, defendant also determined that this proposed wage reduction would lead to an inability to retain the current work force, thereby creating a performance risk. Such a conclusion is rea-

sonable given the fact that plaintiff's proposal pledges that 75% of its work force would be comprised of current Kelly AFB employees.[151] In light of this statement, it was reasonable for defendant to utilize the current wage rates paid to Kelly AFB employees in arriving at a wage rate for FY98.[152]

■ Further, defendant reasonably concluded that plaintiff's cost proposal is unrealistic because it fails to provide sufficient information on how plaintiff would reduce its overhead and general-and-administrative costs through unspecified commercial work. Although plaintiff's cost proposal indicates that plaintiff would bring over 1,000,000 hours of commercial work into Kelly AFB within approximately two years of contract award, the proposal contains no specifics as to the type or source of such work.[153] In the absence of such information, it was reasonable for defendant to determine that plaintiff's proposal lacks adequate information upon which the evaluators could assess the credibility of plaintiff's proposal.

Plaintiff's assertions that such concerns are irrelevant under a fixed price contract, such as the present one, also are not persuasive. Despite the fact that cost overruns under such a contract are to borne by the contractor, defendant still reasonably may consider risks to performance. *See PHP Healthcare Corp.*, B–251933, 93–1 CPD ¶ 381, at 5 (May 13, 1993) (stating that "an agency may, in its discretion, also provide ... for the use of a cost realism analysis in a solicitation for the award of a fixed-price contract ... to assess the risk inherent in an offeror's approach"). In fact, the solicitation expressly notifies offerors that proposals will be evaluated for realism.[154]

#### b. Lease Rates

■ Defendant also properly concluded that plaintiff's cost proposal is incomplete and unrealistic due to its omission of lease

**150.** In evaluating an offeror's cost proposal, the cost evaluation team looked for "completeness, realism and reasonableness." *Id.*, tab 14, cl. M–900, ¶ 5.2, at 27.

**151.** *Id.*, tab 12, vol. IIA, ¶ 1.1.1, at IIA–1–7.

**152.** In calculating the FY98 wage rate, defendant applied the escalation rate in plaintiff's proposal

to the average wage for Kelly AFB workers in 1996. Def.'s Mot. at 64 n. 26.

**153.** *See* A.R., tab 12, vol. IIA, at IIA–2–23 to – 50.

**154.** *Id.*, tab 14, cl. M–900, ¶ 5.2, at 27.

rates for the facilities plaintiff proposed to use in performing the contract. The solicitation expressly requires that "[p]rivate [o]fferors proposing to use [the existing] facilities and equipment at Kelly AFB must make arrangements with the Greater Kelly Development Corporation (GKDC)."[155] The solicitation also requires that all proposals include data for necessary costs, including facilities costs.[156]

In its proposal, plaintiff states that it could not provide facilities costs because the GKDC had not provided it with the necessary lease costs.[157] Plaintiff specifically complains that the GKDC had not provided lease rates for the C–5 complex and equipment to enable plaintiff to incorporate these costs into its proposal. Despite plaintiff's assertion, however, the record, as well as the parties' joint stipulation of material facts, shows that the GKDC provided tentative lease rates to all offerors on March 14, 1997.[158] As the parties stipulate, "[r]ather than use this data, [plaintiff] simply informed [defendant] that it would pass the lease costs through to [defendant] once the GKDC provided [plaintiff] with the lease rates."[159] Given the fixed-price nature of the contract and the fact that the GKDC had provided interim lease rates to the offerors for use in their bids, it was reasonable for defendant to mark down plaintiff's proposal for failing to include at least some lease rate estimate.

In consideration of the explicit solicitation requirements, this court refuses to accept plaintiff's argument that the acceptability of interim lease costs represents a change to the solicitation requirements, which was not communicated to plaintiff. Likewise, this court is unpersuaded by plaintiff's contention that other offerors proposed interim costs and plaintiff's proposal is being unfairly measured against a standard of which it was unaware.

This court also denies plaintiff's claim that "[s]ince [defendant] apparently had access to the GKDC preliminary figures, there is no difference between an offeror who submits non-binding interim costs and [plaintiff's] offer to pass through costs."[160] The distinction between the two situations is clear. In the first instance, the offeror has demonstrated some arrangements with the GKDC and has provided defendant with some cost estimate. In the second circumstance, both of these showings are absent. Lastly with respect to lease costs, this court rejects plaintiff's argument that, if defendant must do a cost evaluation, it can use the GKDC's preliminary costs for plaintiff's proposal.[161] It is plaintiff's responsibility to submit a complete and realistic proposal, not defendant's duty to fashion such a proposal where plaintiff's efforts fall short.

### C. *Violation of Statute or Regulation*

Based upon the forementioned inadvertently disclosed information, plaintiff amended its complaint to include allegations of statutory and regulatory violations. First, plaintiff raises vague allegations regarding the CICA. Next, plaintiff contends that defendant's evaluators improperly compared the offerors' proposals in contravention of AFFARS, Appendix AA–206 (AFFARS AA–206). Plaintiff also claims that they evaluated the proposals inconsistently, *i.e.*, accorded the proposals disparate treatment, in violation of 48 C.F.R. § 15.603 (1996) (FAR 15.603). Finally, plaintiff charges that defendant's evaluators violated applicable regulations in failing to consider the entirety of plaintiff's proposal during the review process.

 In order to prevail on its statutory and regulatory violation claims, however, plaintiff "must do more than raise an issue

**155.** *Id.*, tab 14, cl. L–901, at 25. The GKDC is the Local Redevelopment Authority established by the City of San Antonio to transition Kelly AFB from military to civilian use. Def.'s Mot. at 66 n. 27.

**156.** A.R., tab 14, cl. L–900, ¶ 5.1, at 23–24.

**157.** *Id.*, tab 12, vol. III, at III–1–1.

**158.** *See Id.*, tab 25; *see also* Joint Stipulation of Material Facts (Jt.Stip.) ¶ 44.

**159.** Jt. Stip. ¶ 44; *see also* A.R., tab 12, vol. III, at III–1–1.

**160.** Pl.'s Resp. at 15.

**161.** *Id.*

concerning a violation of any law or regulation." *RADVA Corp. v. United States*, 17 Cl.Ct. 812, 819 (1989). Indeed, a violation of a statute or regulation will not necessarily result in a finding of government liability. *Id.; see also CACI*, 13 Cl.Ct. at 726. Rather, there must be a *"clear and prejudicial* violation of applicable statutes or regulations." *DeMat Air, Inc. v. United States*, 2 Cl.Ct. 197, 202 (1983) (emphasis added). Moreover, such a violation must be sufficient to deny plaintiff "the impartial consideration to which it was entitled under the implied contract obligations of the government." *Arrowhead Metals, Ltd. v. United States*, 8 Cl.Ct. 703, 714 (1985).

 Although the burden to establish prejudice is high, it is not so high as to require plaintiff to show that "but for the alleged error, [plaintiff's proposal] would have been [placed within the competitive range]." *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed.Cir.1996). Conversely, it also is insufficient to merely demonstrate a possibility that plaintiff's proposal "would have [remained in the competitive range] but for the error." *Id.* Because the appropriate standard falls somewhere in between these extremes, in order to prove prejudice, plaintiff must show that "there was a substantial chance [plaintiff's proposal] would have [been found to be within the competitive range] but for that error." *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1582 (Fed.Cir.1996). Plaintiff has not satisfied this burden as to any of the alleged violations.

### 1. *Competition in Contracting Act*

Beyond asserting that the CICA requires defendant to evaluate competitive proposals and award contracts based solely upon factors specified in a solicitation, plaintiff does nothing to specifically indicate to this court how defendant allegedly violated the stat-

ute.[162] In the CICA context, however, plaintiff notes that the solicitation at issue specifies the grounds for exclusion of a proposal from the competitive range. In addition, plaintiff indicates that a decision on such matters must have a reasonable basis and comply with applicable laws and regulations. This court therefore presumes, as does defendant,[163] that plaintiff is simply rearguing the same points raised in its challenges to the reasonableness of defendant's competitive range determination. Those arguments have already been rejected by this court.

To the extent that any portion of plaintiff's CICA claim is based upon alleged regulatory violations by defendant, such allegations also must fail. The reasons for this conclusion are set out in the following discussion.

### 2. *Comparisons*

Plaintiff's amended complaint contains allegations that defendant acted in violation of applicable regulations by improperly comparing the offerors' proposals against one another in determining whether a proposal was to remain within the competitive range. Such comparisons are expressly prohibited by AFFARS AA–206,[164] which governs the conduct of this procurement as stated in the solicitation.[165] Further, the deposition testimony of Ms. Druyun and Ms. Simpson verifies the applicability of this prohibition to procurements in general.[166] More significantly, the deposition testimony of Ms. Simpson indicates that she is unaware of any such comparisons having been made during the competitive range determination at issue here.[167]

#### a. *Transition*

██ Notwithstanding the testimony of Ms. Simpson, the record indicates one instance where a comparison arguably may have been made by one of defendant's evalu-

---

162. Compl. ¶ 59.

163. Def.'s Mot. at 69.

164. "The [Source Selection Evaluation Board] shall *not* compare proposals against each other." AFFARS AA–206(a), included at A.R., tab 21, at AA–12. In addition, the Source Selection Evaluation Guide notes that individual evaluators on this particular procurement "will not" compare

proposals to each other. A.R., tab 11, ¶ 5.2.2.1, at 14.

165. *Id.*, tab 14, cl. M–900, ¶ 2.3, at 25.

166. Druyun Dep. at 54–55; *see* Deposition of Jessie M. Simpson (Simpson Dep.) at 21.

167. Simpson Dep. at 17, 19–21, 31, 35–36.

ators. This court refers specifically to the observation of an evaluator on the transition factor that "[o]ne of the [transition experience] examples given [by plaintiff] is the same example given for offeror [X]." [168] Arguably, this comment indicates that the evaluator "compared" plaintiff's proposal with that of Offeror X.

A "comparison" is defined as "the representing of one thing ... as similar to or like another[; or] an examination of two or more items to establish similarities and dissimilarities." Webster's New Collegiate Dictionary 229 (G. & C. Merriam Co.1977). Under this definition, it appears that a "comparison" was made prior to the evaluator concluding that the experiences were "the same." On the other hand, however, the evaluator's statement simply may indicate the evaluator's awareness of the fact that both plaintiff and the other offeror utilized the same example. This interpretation finds support in plaintiff's proposal itself. Notably, in describing this experience, plaintiff's proposal explicitly notes that two of plaintiff's "[k]ey ... personnel have managed [a] very similar transition ... at [Offeror X's facility]." [169] Thus, plaintiff itself offered a "comparison" of its experience with that of Offeror X. [170]

Even assuming *arguendo* that a violation of the regulations occurred, this court still must conclude that such violation was not prejudicial to plaintiff. *See Data Gen.*, 78 F.3d at 1562 (citing to numerous cases that support this conclusion). Because plaintiff put the information regarding the relationship between its experience and that of Offeror X before the evaluation team, it cannot be said that one evaluator's observation that the experiences were the same prejudiced plaintiff. This result is all the more true given the fact that plaintiff's proposal was awarded transition experience credit for the very experience mentioned in the evaluator's comment. In any event, this court will not overturn a reasonably-based procurement decision, made within the discretion of defendant's contracting officials, due to a harmless

regulatory violation such as arguably occurred in the present case. *See TRW Envtl. Safety Sys., Inc. v. United States*, 18 Cl.Ct. 33, 67 (1989).

b. *Pages in SSA Briefing*

 The only basis cited by plaintiff in support of its contention that defendant's evaluators improperly compared plaintiff's and other offerors' proposals is the fact that several pages in the unredacted SSA briefing show information "from the evaluation of all four offerors ... comparatively displayed on the same page." [171] Plaintiff avers that, whatever the intent, the effect of the inclusion of this information in the SSA briefing indicates that inappropriate comparisons among the proposals occurred. This court does not agree. Rather, this court concludes that plaintiff's charges simply intimate that defendant's contracting officials, when presented the information in this format, would have been unable to refrain from making the improper comparisons. Such speculation is insufficient to make the requisite showing of a clear and prejudicial violation of the applicable regulation. *See Data Gen.*, 78 F.3d at 1562 (noting the high burden that a plaintiff must meet).

3. *Disparate Treatment*

 Plaintiff also alleges that its proposal was accorded disparate treatment during the competitive range evaluation process, which violates FAR 15.603. Specifically, plaintiff asserts that other offerors' proposals contained weaknesses similar to those identified for the transition and production operations portions of plaintiff's proposal, but that those proposals were not marked down as severely as plaintiff's proposal, much less eliminated from the competitive range.

In support of its contention, plaintiff relies, in part, upon the types and number of CRs and DRs prepared for plaintiff and the other offerors. Plaintiff, however, has not shown that the severity of the deficiencies in the other proposals was of the same magnitude

---

**168.** A.R., tab 9, at 10.

**169.** A.R., tab 12, at IIA–1–22.

**170.** It is immaterial for purposes of this court's conclusions whether plaintiff knew that offeror X was a competitor on this procurement.

**171.** PFOF ¶ 78.

as those found in plaintiff's proposal. Nor has plaintiff convinced this court that its proposal was considered under different standards than the proposals of other offerors. Thus, plaintiff has failed to show, by clear and convincing evidence, that its proposal was subject to disparate treatment.

### a. *Transition*

With respect to its inconsistent evaluation claims, plaintiff contends that the transition portion of its proposal received a "Red–High" rating while another offeror's proposal with similar defects and common experience received a "Yellow–Moderate" rating. As previously noted, each individual proposal is considered as a whole. As such, plaintiff's attempts to isolate certain similarities, while ignoring the larger picture, is insufficient to support its inconsistent evaluation claim. This conclusion is all the more valid given the discretion afforded contracting officials, as well as the presumption that they act properly in the exercise of their official duties. *Finley*, 31 Fed. Cl. at 706.

It is further immaterial that the transition experience cited by the other offeror included "maintenance work ... performed under the direction of [two of plaintiff's] principals."[172] Mere inclusion of that detail does nothing to diminish the fact that the referenced maintenance work actually was performed by the other offeror and presumably its personnel. Moreover, plaintiff's proposal did receive some credit for this transition experience. As such, plaintiff has failed to demonstrate that defendant's evaluation of this portion of plaintiff's proposal was improper or in any way prejudiced plaintiff.

### b. *Production Operations*

In making the argument that its proposal was not fairly evaluated "vis-a-vis other competitors,"[173] plaintiff again relies upon the inadvertently disclosed information in the unredacted SSA briefing. Specifically, plaintiff refers to the sections of the unredacted SSA briefing containing evaluations of the production operations portions of the offerors' proposals and to a page in the SSA briefing that lists the number of CRs and DRs generated for the production operations plans of all four offerors. According to plaintiff, the level of deficiencies identified by defendant's contracting officials for all four production operations proposals "is similar, both in nature and in scope."[174] Nevertheless, plaintiff's production operations plan was determined to require a "rewrite,"[175] while the deficiencies found in other offerors' plans were allowed to proceed to discussions.

As support for this claim, plaintiff quotes several comments made by defendant's evaluators regarding the production operations portion of its and the other offerors' proposals. Nevertheless, one of plaintiff's own statements defeats its argument. More particularly, plaintiff reads the presumption that defendant's contracting officials acted in good faith to mean that "the evaluators must be presumed to have identified CRs and DRs in a consistent manner and used similar descriptions in the SSA Briefing document to address similar problems. To assert otherwise would be to assume that the evaluators did not use the same standards and procedures in evaluating each offeror."[176] Notwithstanding plaintiff's explanation, this court disagrees that this interpretation necessarily leads to the conclusion that "[plaintiff] was no worse than its brethren."[177] In reaching its decision, this court pays particular attention to plaintiff's use of the terms "similar descriptions" and "similar problems." This language demonstrates that the descriptions of the deficiencies are not the "same." Under plaintiff's own characterization of the presumption that should be applied, had the evaluators determined that the problems were the same, they then would have given them the same descriptions. Such is not the case.

To the contrary, the record shows that the deficiencies noted for the production operations portion of each offeror's proposal, while

---

**172.** *Id.* ¶ 33.

**173.** Pl.'s Resp. at 11.

**174.** PFOF ¶ 61.

**175.** A.R., tab 4, at 162.

**176.** Pl.'s Resp. at 11.

**177.** *Id.* at 12.

arguably similar, clearly are not the same. The following example concerning compliance language demonstrates this distinction. While the evaluators concluded that plaintiff's proposal contained "Poor Contractual Statements" [178] and was "Not Written In Contractually Binding Language," [179] they determined that certain other proposals simply required "Compliance Language Revisions." [180] Clearly, these descriptions demonstrate that the evaluators considered the compliance language factor when reviewing each proposal but reached different conclusions as to the magnitude of the problem in each. Thus, it is reasonable to conclude that the evaluators uniformly applied the review standards.

In addition, by citing this court to the inadvertently disclosed numbers of CRs and DRs generated for all four proposals, plaintiff is essentially asking this court to compare the numbers and conclude that the SSA's determination cannot be reasonable because the number of CRs and DRs generated for some of the other offerors' proposals exceeded the number generated for plaintiff's proposal. Ironically, such a comparison is exactly the type of comparison that plaintiff intimates was improperly made by the SSA in contravention of AFFARS AA–206. This court already has concluded that no such comparison was made. Further, this court will not engage in such a comparison here. Given this court's prior statement that the magnitude to be assigned a deficiency is within the discretion of defendant's contracting officials, this court will not now second-guess their decisions.

In any event, a mere numerical comparison regarding the CRs and DRs is not sufficient to demonstrate that plaintiff's proposal was unfairly considered by defendant's evaluators. The record before this court shows that the evaluators' comments clearly indicate a difference in the magnitude of the deficiencies cited for each proposal. Moreover, one deficiency of the magnitude of "not

contractually binding" may alone suffice to keep that offeror's proposal out of the competitive range. Under such circumstances, it is therefore immaterial to consider whether another offeror's proposal had two or even ten deficiencies, any or all of which may not have risen to the same level as the one cited for the first offeror.

### 4. *Inadequate Review*

As previously noted, applicable regulations provide that, in making any competitive range determination, the contracting officer and SSA must consider an offeror's proposal as a whole and, based upon the initial evaluation of the proposal, determine whether the offeror has a reasonable chance of award. FAR 15.609; AFFARS App. AA–311(c). Plaintiff repeatedly asserts that, in order to arrive at their conclusions, defendant's evaluators must have failed to consider the entirety of plaintiff's proposal. These arguments have been previously addressed and rejected by this court.[181] As such, this court concludes that plaintiff has failed to show, by clear and convincing evidence, that defendant acted in violation of this regulation.

### *Conclusion*

For the foregoing reasons, defendant's motion for summary judgment is granted and plaintiff's motion for summary judgment is denied. Accordingly, the Clerk is directed to dismiss plaintiff's amended complaint. No costs.

IT IS SO ORDERED.

---

178. A.R., tab 4, at 44.

179. *Id.* at 162.

180. *Id.*, tab 4a, at 21, 87.

181. For example, see this court's discussion of plaintiff's allegations involving the material requirements portion of its proposal, *supra* pp. 750–752.